IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

MARK CARMAN, Individually  )
and on behalf of All       )
Others Similarly Situated, )
                           )
        Plaintiff(s),      )
                           )
  V.                       ) NO. 2:22-cv-00313
                           )
PORTSMOUTH REDEVELOPMENT    )
AND HOUSING AUTHORITY,      )
                           )
        Defendant.         )

DEPOSITION UPON ORAL EXAMINATION OF

MARK L. CARMAN

TAKEN ON BEHALF OF THE DEFENDANT

Portsmouth, Virginia

Monday, May 15, 2023

**EXHIBIT**

2



ZAHN
COURT REPORTING
www.zahncourtreporting.com

1          Q       Okay.

2          A       No, I don't think I told him I did.

3   I think he found out through a letter from the law

4   firm.

5          Q       Okay.

6          A       I don't think I talked -- because I

7   didn't talk to him the entire time I was in the

8   Philippines.

9          Q       Okay.  When was the first time that

10  you provided services for the Authority, do you

11  remember?

12         A       I want to say June of 2021.

13         Q       And how -- go ahead.

14         A       Or July.  It was either June or

15  July, I'm not sure.

16         Q       Okay.  And how did you come in

17  contact with the Authority such that you engaged

18  in this relationship?

19         A       They ran an advertisement on

20  Indeed.

21         Q       Okay.

22         A       Posted it as an hourly wage

23  position.  I responded.  I was interviewed.

24         Q       Do you remember with whom you

25  interviewed?



```
 1          A       Keyond Gorley.

 2          Q       Okay.

 3          A       And then a second interview with

 4  Mr. Bland, and others were in the room.

 5          Q       Okay.  And how was the offer to

 6  provide services to the Authority made to you?

 7          A       You mean in writing or verbal?

 8          Q       Right, correct.

 9          A       It was verbal.

10          Q       Okay.  And do you recall what that

11  offer was?

12          A       It initially was $19 per hour.

13          Q       Okay.

14          A       And then it, I want to say within a

15  week or two, it was $20 an hour, and then it went

16  to $22 an hour.

17          Q       Okay.  Did you actually start

18  working at 19 or --

19          A       Yes, ma'am.

20          Q       Okay.

21          A       I believe my first paycheck was at

22  19.  I think so.

23          Q       Okay.

24                  All right.  So over a short period

25  of time it increased to $22 per hour?
```



```
 1          A      Yes.
 2          Q      And was that the amount per hour
 3   that you agreed to be paid?
 4          A      Yes.
 5          Q      Until the end of your services?
 6          A      Yes.
 7          Q      Okay.  When you worked by the hour.
 8          A      Right.
 9          Q      Okay.  Did they have other security
10   guard officers providing the same services when
11   you first engaged with them?
12          A      No.
13          Q      So you were the first security
14   guard officer providing security for them?
15          A      No, but with a qualification.
16          Q      Okay.
17          A      There was a captain from the
18   Sheriff's Department that had been dismissed from
19   the Sheriff's Department and he was working there,
20   and I'm told they were paying him and -- through
21   the -- I was told when I went to work there he was
22   getting paid as an off-duty police officer,
23   because they were getting paid much more per hour
24   than we were.
25          Q      Okay.  And that brings me to your
```


ZAHN
COURT REPORTING
www.zahncourtreporting.com

1        A      I did.

2        Q      Okay.  Mr. Carman, is it fair to

3   say that you were paid directly by the Authority

4   every two weeks?  Do you recall that?

5        A      On the normal payroll cycle, yes.

6        Q      Okay.

7        A      That would be every two weeks.

8        Q      Okay.  And tell me how you

9   submitted time to the Authority so that you could

10  get paid for your hours worked.

11       A      We were required to complete a

12  timecard showing the hours worked.

13       Q      Okay.  Tell me what that timecard

14  looked like.

15              And they provided it to you?

16       A      Keyond Gorley gave us an Excel

17  sheet for us to write in our time, and we did

18  that.  And I just went ahead and typed it up

19  because it was easier for me to keep records of it

20  for myself to save what I turned in.

21       Q      Okay.

22       A      And then we would give those to

23  Keyond Gorley.

24       Q      Okay.  So when you said an Excel

25  sheet, was it a printout of like --


ZAHN
COURT REPORTING
www.zahncourtreporting.com

```
 1           A       Yes.

 2           Q       Okay.

 3           A       With the grids.

 4           Q       Okay.

 5           A       And it said hours, you know, time

 6    in, time out, hours worked; yes.

 7           Q       Okay.  But you decided to type it

 8    up yourself for recordkeeping purposes and so

 9    could you read it and turn it in?

10           A       Yes.

11           Q       Okay.  Did they dispute --

12           A       I gave it to Keyond for him to

13    approve it.

14           Q       Okay.

15           A       I turned it into an Excel form

16    because I said, This looks sloppy, so...

17           Q       Okay.  So did they dispute with you

18    how you turned it in?

19                   They just wanted some recording of

20    your hours worked, right, and your time in and

21    time out?

22           A       I never heard any dispute about it.

23           Q       Okay.  And did you submit all your

24    hours worked when you provided services to the

25    Authority the whole time you provided services?
```



```
 1          A      Not after I went on salary.
 2          Q      Okay.  So before you went on
 3   salary, did you submit to them all the time that
 4   you worked?
 5          A      Yes.
 6          Q      And did you get paid either 19, 20
 7   or $22 an hour for all that time?
 8          A      Straight time, yes.
 9          Q      Straight time.
10          A      Yes.
11          Q      So you got all your straight time.
12          A      I had no question with my pay --
13          Q      Okay.
14          A      -- on that regard.
15          Q      Okay.
16          A      And I will say this.  If there ever
17   was a discrepancy with myself or the other people,
18   it was a matter of addressing it, and it -- and
19   getting paid what was due was never a problem in
20   that regard.
21          Q      Okay.  And when you got the payment
22   from the Housing Authority, you noticed, correct,
23   that there were no payroll taxes or anything
24   deducted therefrom; right?
25          A      Yes.
```



```
 1          A       I do.
 2                  (Offer of Employment, two pages
 3                  marked as Carman Exhibit Number 3)
 4  BY MS. NORTH:
 5          Q       Okay.  Is that your signature on
 6  the second page?
 7          A       Yes.
 8          Q       And it says that the Portsmouth
 9  Redevelopment and Housing Authority is pleased to
10  extend you an offer of employment for the position
11  of security program and risk management officer at
12  an annual salary of $48,620; is that right?
13          A       That is.
14          Q       So does this refresh your
15  recollection on when you became full time employed
16  as a W-2 employee with the Authority?
17          A       It does.
18          Q       Okay.  And before this time, tell
19  me in what capacity you were working as far as
20  full time, part time, and what you were doing
21  before this, right before this time.
22          A       From August until this date --
23          Q       Okay.
24          A       -- I was working full time.
25          Q       Okay.  And what were you doing for
```



1          Q        Did you take over that position, is

2     that --

3          A        Kind of like he did when Keyond

4     Gorley left.  I was the senior guy there, so it

5     was left up to me.

6          Q        Okay.  So when you were hired as an

7     employee in February -- on February 22nd, 2022,

8     you knew that was an employee, full time, and you

9     got your benefits and a guaranteed salary; right?

10         A        I knew it was and I knew how it got

11    there is because I had been telling him,

12    Mr. Bland, You promised to put me full time in

13    September, and you haven't done it, and I either

14    need a job or I'm going to go get one and I'm

15    going to file a lawsuit on you.

16         Q        Okay.  But you knew when you were

17    hired in February of 2022 that you were hired to

18    manage this department with a guaranteed salary

19    and the benefits that came along with that as

20    stated in this offer letter; right?

21         A        As stated in this offer letter,

22    yes.

23         Q        Okay.

24         A        I was -- I knew that, but I was

25    always -- the answer is yes.



1          Q       I understood that you were

2     complaining about it beforehand, but I'm just

3     trying to establish when you were hired --

4          A       I understand.   The timing is this

5     day.

6          Q       Okay.   And I want to get an

7     understanding from you of what your job was.

8                  You were to take over and to manage

9     the department and manage the other security

10    guards; right?

11         A       By this letter.

12         Q       Yes.

13         A       By -- I will say this.   My

14    testimony will be that I signed this under duress.

15    I signed this because it says on the back that I

16    had until 5 o'clock to do it --

17         Q       Okay.

18         A       -- and I wouldn't have a job if I

19    didn't do it, if I didn't accept this.   And I

20    complained about it, I argued about it, but I

21    needed to have a job.

22         Q       Okay.

23         A       So, yes.

24         Q       So you just said you had bugged

25    Mr. Bland about doing this, and he gave it to you.



1            So why were you signing under

2    duress if it's what you wanted?

3        A       Because it wasn't near the amount

4    that I was supposed to get.  It was -- it was

5    nothing.  And, plus, he told me that this

6    (indicating) didn't mean anything; just to keep

7    doing what I was doing.  That's what he told me.

8        Q       Okay.

9        A       He said, This job description, you

10   don't need to do all that insurance stuff, you

11   don't do any of that stuff.  You just go keep

12   doing what you are doing.

13       Q       Okay.  So we will talk about what

14   you did then instead of the job description.

15            But just to be complete, if you

16   look at what we've entered as Exhibit Number 4, it

17   does say this was a job description for the

18   security program -- programs manager, which you

19   were given when you were offered this full-time

20   job in February 2022; right?

21       A       Yes.

22            (Classification Description, four

23            pages marked as Carman Exhibit

24            Number 4)

25



```
1              A        That was way early on.

2              Q        All my questions right now are

3      after you signed the February 22nd, 2022 letter

4      where you became the manager of this department.

5      You didn't have to hire anyone because you had the

6      staff already in place, you're saying; right?

7              A        Correct.

8              Q        Okay.  And did you have the

9      authority to recommend someone be disciplined or

10     terminated if they messed up who was on your team?

11             A        It was made specifically clear to

12     me by Ed Bland I didn't have any authority to do

13     anything.  He gave me that to shut me up

14     (indicating).

15             Q        Okay.  So the whole time that you

16     managed the team of people providing security

17     services to the Authority, you're saying you

18     didn't feel like you had the authority to go to

19     him and say, So-and-so messed up.  We need to

20     write him up or terminate her.

21             A        Ma'am, as of the date of this, I

22     got an email that said I'm no longer to have any

23     contact with Ed Bland and I have to do everything

24     through Valerie Jenkins.

25             Q        Okay.  When was that?
```



```
 1           A        Like the next day or so.

 2           Q        Okay.

 3                    All right.  So, technically, you

 4    reported to Valerie Jenkins after you signed that

 5    document, Exhibit Number 3?

 6           A        Yes.

 7           Q        Okay.

 8                    All right.  Did you make the team

 9    schedules after the February 22, '22 letter, 2022

10    letter?

11           A        Those schedules were submitted as a

12    recommendation to Valerie Jenkins, and she

13    approved it.

14           Q        Okay.  Did you communicate with the

15    team members on your team about the schedules and

16    where -- what to patrol, what properties to patrol

17    and, et cetera?

18           A        Yes.

19           Q        Okay.  Did the team members submit

20    any of the daily reports to you at the end of the

21    shift or end of the day?

22           A        They all reported to me at the end

23    of the shift and the end of the day.

24           Q        Okay.

25           A        Yes.
```


ZAHN
COURT REPORTING
www.zahncourtreporting.com

1          Q       Okay.  And then did you submit

2   whatever you submitted to higher level management

3   to Valerie Jenkins?

4          A       Yes.

5          Q       Okay.  Did you have to request that

6   anybody on your team be disciplined for any

7   wrongdoing or misconduct?

8          A       No.

9          Q       Okay.  Did you recommend that any

10  of them receive any kind of pay raise during the

11  time you managed them?

12         A       No.

13         Q       Did you have the authority to

14  recommend to Valerie that you thought someone

15  needed a pay raise?

16         A       No.

17         Q       So Valerie would just determine for

18  herself without any input from you if someone

19  needed a raise?

20         A       It never came up.  I wouldn't have

21  any idea.

22         Q       Okay.  Did you go through the

23  Portsmouth Authority's orientation for new hires

24  when you -- after you signed this letter?

25         A       Yes.



```
 1          Q       Okay.  And do you remember what
 2   that consisted of, what type of training that was?
 3          A       Handed me a booklet and said, Read
 4   this, sign here.
 5          Q       Okay.  Employee handbook?
 6          A       Um-hum.
 7          Q       And did you do that?
 8          A       Yes.
 9          Q       Okay.  Did they tell you you don't
10   need to record any hours at all for yourself?
11          A       No.  They told me that I had to
12   turn in 40 hours.  I asked the question, So then
13   what happens if I get called out at it 2 o'clock
14   in the morning because there's a shooting?
15                  Just turn in 40 hours.
16          Q       And how many people were on your
17   team after February 22nd?
18          A       Myself plus three.
19          Q       And who were the three?
20          A       Tenisha Stithe --
21          Q       Okay.
22          A       -- Kevin Perry and Nathaniel
23   Jackson.
24          Q       Was it the three of them until you
25   resigned?
```



1          Q          Okay.

2          A          Maybe I'd been through enough and I

3    was just defeated.

4          Q          Here is the next exhibit.

5                     (2/24/22 email from Carman to

6                     Bland, one page marked as Carman

7                     Exhibit Number 5)

8    BY MS. NORTH:

9          Q          What we've entered as Exhibit 5 is

10   an email from you to Mr. Bland; right?

11         A          Yes.

12         Q          And Edward Bland is the executive

13   director of the Authority; correct?

14         A          Yes.

15         Q          Okay.  And it says as of

16   February 24th 2022, you were confirming in an

17   email some of the directives he had given you

18   about the use of force and carrying weapons in

19   your department; right?

20         A          That's correct.

21         Q          Some things were changing; is that

22   right?

23         A          Yes.

24         Q          Okay.  And so was it up to you to

25   go back to your team members, Tenisha, Kevin, and

```
1    Nathan, and make sure they understood these

2    changes?

3            A       Yes.

4            Q       Okay.  And were you to serve as the

5    compliance officer overseeing the accurate

6    documentation regarding all training and licensing

7    for the department?

8            A       I've never been certified as a

9    compliance officer.

10           Q       I don't -- I'm not talking about

11   any kind of official certification.

12                   Were you designated like you said

13   here to serve as the compliance officer for the

14   Authority about overseeing training and licensing?

15           A       That's what I had in mind at this

16   time.

17           Q       Okay.  Let me show you these last

18   documents.

19                   There you go.

20                   Mr. Carman, what we've entered as

21   Exhibit Number 6 is an email.  At the bottom you

22   will see it's from you to Edward Bland with some

23   other individuals copied who are at the Authority;

24   right?

25           A       Yes.
```



```
 1                    (2/24/22 emails re:  Reduction in
 2                    security availability and
 3                    capability, two pages marked as
 4                    Carman Exhibit Number 6)
 5    BY MS. NORTH:
 6          Q     And, again, it was to document and
 7    implement some directives about reducing security
 8    staff hours, not having weekend patrols, and that
 9    the -- the fact that some -- some folks would be
10    unarmed; is that right?
11          A     Whatever it says on the paper, yes.
12          Q     Okay.  And were you responsible for
13    making sure that the staff didn't work any more
14    hours than what was directed to you?
15          A     No.
16          Q     Who made sure that the hours
17    weren't exceeded?
18          A     Valerie Jenkins -- or Valencia
19    Jenkins.
20          Q     Okay.
21          A     I keep calling her Valerie Jenkins.
22    It's Valencia.
23          Q     Okay.
24          A     It's -- "Val" is what we always
25    called her.
```



1          A       Absolutely none.

2          Q       Okay.  And let me see here.

3                  This is what I need next.  This is

4    your resignation.  I forgot to put a sticker on

5    it.  Forgive me.

6                  Do you recognize that, Mr. Carman?

7          A       I do.

8          Q       Okay.  What we've entered as

9    Exhibit Number 9 is your resignation; is that

10   right?

11         A       Yes.

12         Q       And it's dated May 3rd, 2022?

13         A       Yes.

14                 (5/3/22 email re:  My resignation,

15                 two pages marked as Carman Exhibit

16                 Number 9)

17   BY MS. NORTH:

18         Q       Did you depart on May 3rd, 2022,

19   that same day?

20         A       I'm pretty sure I did.

21         Q       I just didn't know if you recalled

22   giving any kind of notice.

23         A       No.

24         Q       All right.  And so you told the

25   Authority that you were resigning and that you



1    know other than -- what I understand is that this
2    action is exclusive for unpaid overtime wages.
3          Q      Okay.  I appreciate that.
4                 Let me hand you the last exhibit.
5          A      Okay.
6          Q      It's your pay.
7                 And do I have that right?  Is that
8    10?
9          A      Yeah, this is 10.
10                (Pay Detail, 45 pages marked as
11                Carman Exhibit Number 10)
12   BY MS. NORTH:
13          Q      Take a look at that packet,
14   Mr. Carman, and I need you to clarify whether
15   that's all the hours you submitted and this is all
16   the pay that you received from the Authority.
17          A      Do you want me to go through every
18   single one of these?
19          Q      Yes, sir.  Hopefully it's the not
20   the first time you've been seeing some of this
21   stuff, so...
22          A      Well, it is.  It will take awhile.
23          Q      Take your time.
24          A      May I ask a couple qualifying
25   questions to kind of short-shoot through this?



```
 1            Q       Sure.
 2                    And let me direct your attention to
 3      the first thing right here.
 4                    If you look on the second page,
 5      Number 2, is that something you all would submit,
 6      your team, to the Portsmouth Authority?
 7            A       Yes.
 8            Q       It has hours.
 9                    So if you look -- that's why I was
10      hoping you can see your name and you can see the
11      dates you worked and the hours you worked and the
12      rate.
13            A       Um-hum.
14            Q       So can you verify that?
15            A       This appears to be correct.
16            Q       Okay.
17            A       As far as the total and all that, I
18      would have to go here line by line and go based
19      off the emails and stuff where I emailed these in
20      and kept my own records, but I'm pretty sure,
21      because some of these documents -- this one here,
22      this is signed by Marc Gonzalez.
23            Q       Sometimes they have both your names
24      on it --
25            A       Yeah.
```


ZAHN
COURT REPORTING
www.zahncourtreporting.com

1       Q       -- because it's both of you.

2               So it's just for you to verify on

3   behalf of yourself, not on behalf of anybody else.

4       A       I'm going to do this.  I'm going to

5   say it this way.  Based upon my experience in

6   accounting with the PRHA, I'm going to assume this

7   is a thorough document and I'm going -- my

8   testimony -- my answer will be that, qualified

9   with this.  If all of the pay sheets are here,

10  this would be an accurate assessment --

11      Q       Correct.  Okay, I appreciate that.

12      A       -- instead of going through line by

13  line.

14      Q       I understand that.

15              All right.  And if you could look

16  at that, this is for the time that you worked

17  before you became an employee in February of 2022.

18              If you look at this, it takes you

19  through the end of 2021.

20      A       Yes.

21      Q       Okay.  And so, again, if you turn

22  to the second page of Exhibit 10 and you see your

23  name and the date worked and the hours worked and

24  the hours and the rate, of course you submitted

25  those hours; right?  On behalf of yourself.



1              Do you see where it says Mark
2    Carman?
3         A     Yes, I submitted those to the
4    supervisor.
5         Q     Okay.  So whenever we see this type
6    of document in your packet related to you and your
7    hours, you are testifying that those are accurate
8    hours that you worked during that time?
9         A     Not being able to dispute it and
10   knowing the accounting of my previous
11   experience --
12        Q     Yes, sir.
13        A     -- I'm going to stipulate that is
14   accurate.
15        Q     Okay.  Thank you.
16        A     I believe that to be accurate.
17        Q     Okay.  So I lied a little bit.  I
18   thought that was the last exhibit, but this is
19   actually the last exhibit.
20        A     I don't want to have to say in
21   front of this court reporter that I need to use
22   the bathroom.
23        Q     Let's go ahead and take a break.
24        A     If you just got one more
25   document...



```
 1            Q       Let's -- it's certainly fine for

 2   you to take a break.

 3            A       I didn't want that in the record,

 4   but...

 5            Q       It's okay.

 6            A       I know.

 7            Q       Here you go.  Take a look at that

 8   for me, Mr. Carman.  I would submit that this is

 9   your pay for the time that you were an employee

10   and being paid a salary.

11            A       Okay.

12                    (Pay Summary, seven pages marked

13                     as Carman Exhibit Number 11)

14   BY MS. NORTH:

15            Q       So you just look at that and let me

16   know --

17            A       Yes, I'll stipulate this is

18   accurate because I never seen -- I have never seen

19   these type sheets.

20            Q       Okay.  But I just want you to look

21   at the information on it.

22                    Your salary, according to the

23   payroll, was 1870 biweekly based on the salary in

24   your employment letter; right?

25            A       I believe that would be accurate.
```



1    worked?

2           A      I am asserting that, yes.

3           Q      Okay.  So we need to go through and

4    from February 22nd of 2022 through May 3rd, I need

5    to know how many hours per week you're saying you

6    worked.

7           A      I -- it would be mere speculation

8    because it really was around-the-clock.  It would

9    be work a normal 40-hour week; okay?  That normal

10   40-hour week would be arrive at about 8:30 --

11          Q      Okay.

12          A      -- and then I would work about four

13   to six hours, then come back because most of our

14   work would be in the evening hours.

15          Q      Okay.

16          A      Now, there were times when I would

17   get called out first thing in the morning because

18   there's somebody sleeping in one of the foyers in

19   one of the apartment-type houses.

20          Q      Okay.

21          A      So I would respond to that.

22                 If there's a shooting.  If there's

23   a fire.  If there is some sort of a serious-nature

24   thing, the police were told to notify me.  So I

25   would get a call from 911 dispatch to respond.



1              So I don't have any way of
2    calculating it.
3              I can say that a typical week would
4    be -- it seemed like I worked all the time,
5    because sometimes I did.
6              But a typical week would -- after
7    they cut it back to the 33 hours piece for those
8    guys, I was probably working 60 hours a week,
9    roughly.
10        Q    Okay.  I need you to try to do your
11   best to be as specific as possible because you're
12   claiming unpaid money for it.
13        A    Yeah.  And I don't have any way to
14   back it up because I didn't keep those records.  I
15   was told to turn it in.  So it's mere speculation
16   on my part.  So if I can't prove that, I can't
17   prove it, but I'm just going based on what I can
18   recall.
19        Q    Okay.  And you think you were --
20   you think you worked 60 hours per week?
21        A    And I'm -- I'm going to say that
22   that was -- that that's probably conservative.
23              Let me do it this way.  I would
24   work a shift with them almost every day.  Then I
25   would work four, maybe six, seven hours before



 1        Q        You said they were directed to call
 2   you, so...
 3        A        No, no, no.  I think we're talking
 4   about two different things.
 5        Q        Okay.
 6        A        The 911 dispatch, the police
 7   dispatch or fire dispatch would call my house.
 8        Q        Yeah.
 9        A        I also had a radio that
10   communicated with the police --
11        Q        Okay.
12        A        -- and the fire.  So I had police
13   and fire channels.
14        Q        All right.
15        A        So I would get calls to respond.
16        Q        Okay.
17        A        Now, as far as the employees, yes,
18   we'll go back to our previous conversation -- the
19   previous question -- where if they got in a
20   situation where they ran up on something, hadn't
21   been reported to 911 -- I seem to recall that they
22   rolled up on a stabbing where a woman was
23   murdered, and they got there before 911 got it,
24   I'm pretty sure, because they saw it on normal
25   patrol and I was heading that way when I got the

```
 1    call.

 2           Q       When you got the call.

 3           A       So, yes, they would let me know --

 4           Q       Okay.

 5           A       -- as I would have let them know,

 6    and I always did let them know when 911 called me,

 7    Hey, you need to roll this direction.

 8           Q       Okay.  I'm trying to clarify,

 9    though.

10                   But 911, when the police or

11    firehouse called you, it was because --

12           A       I was the manager.

13           Q       Right, okay.

14           A       That is correct.

15           Q       Okay.

16                   Okay.  And the -- to the best of

17    your recollection, you're going to say you worked

18    60 hours per week, because you're going to have to

19    answer this.

20           A       Yes.

21           Q       It was due today.  And so that's

22    why I'm trying to press you on --

23           A       I understand.

24           Q       -- now is the time to do to the

25    best of your recollection how many hours a week
```

