Mark Carman - May 15, 2023

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

MARK CARMAN, Individually  )
and on behalf of All       )
Others Similarly Situated, )
                           )
         Plaintiff(s),     )
                           )
  V.                       ) NO. 2:22-cv-00313
                           )
PORTSMOUTH REDEVELOPMENT    )
AND HOUSING AUTHORITY,      )
                           )
         Defendant.        )

DEPOSITION UPON ORAL EXAMINATION OF

MARK L. CARMAN

TAKEN ON BEHALF OF THE DEFENDANT

Portsmouth, Virginia

Monday, May 15, 2023



 1   Appearances:

 2

 3               SANFORD LAW FIRM, PLLC
                 By:  SEAN SHORT, ESQUIRE
 4               10800 Financial Centre Parkway
                 Suite 510
 5               Little Rock, AR  72211
                 sean@sanfordlawfirm.com
 6               Counsel for the Plaintiff(s)

 7

 8               GORDON REES SCULLY MANSUKHANI, LLP
                 By:  SUSAN CHILDERS NORTH, ESQUIRE
 9               5425 Discovery Park Boulevard
                 Suite 200
10               Williamsburg, VA  23188
                 snorth@grsm.com
11               Counsel for the Defendant

12

13

14

15

16   Also Present:

17               Karen James, General Counsel for PRHA

18

19

20

21

22

23

24

25



```
 1                        I N D E X

 2

 3   DEPONENT                                         PAGE

 4   MARK L. CARMAN

 5     Examination by Ms. North                        5

 6

 7

 8

 9

10                    E X H I B I T S

11   NO.              DESCRIPTION                     PAGE

12   Exhibit 1    W-9                                  22

13   Exhibit 2    Payment Enrollment Form              24
                  three pages
14
     Exhibit 3    Offer of Employment                  45
15                two pages

16   Exhibit 4    Classification Description           49
                  four pages
17
     Exhibit 5    2/24/22 email from Carman to         76
18                Bland, one page

19   Exhibit 6    2/24/22 emails re:  Reduction in     78
                  security availability and capability
20                two pages

21   Exhibit 7    2/24/22 email/attachment, ten        82
                  pages, re:  Misclassification of
22                worker status

23   Exhibit 8    2/22/22 email/attachment             84
                  Carman000001-10
24

25
```



1                E X H I B I T S (Continued)

2    NO.                  DESCRIPTION                    PAGE

3    Exhibit 9     5/3/22 email re:  My resignation   85
                   two pages
4
     Exhibit 10    Pay Detail                          93
5                  45 pages

6    Exhibit 11    Pay Summary                         97
                   seven pages
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                   Deposition upon oral examination of
 2      MARK L. CARMAN, taken on behalf of the Defendant,
 3      before Kerry E. Zahn, Registered Merit Reporter, a
 4      eNotary and Notary Public for the Commonwealth of
 5      Virginia at large, taken pursuant to Notice,
 6      commencing at 2:00 p.m. on Monday, May 15, 2023,
 7      at the offices of PRHA, 3116 South Street,
 8      Portsmouth, Virginia; and this in accordance with
 9      the Rules of the Supreme Court of Virginia, 1950,
10      as amended.
11
12                        MARK L. CARMAN was sworn and
13      deposed on behalf of the Defendant as follows:
14
15                        EXAMINATION
16      BY MS. NORTH:
17           Q      Okay.  Good afternoon, Mr. Carman.
18           A      Good afternoon.
19           Q      Again, I'm Susan North, and I
20      represent Portsmouth Redevelopment and Housing
21      Authority.  If you don't mind, I may refer to it
22      as just "the Authority."
23           A      That's fine.
24           Q      Does that make sense?
25           A      I understand.
```



1         Q      All right.  Have you ever had your

2    deposition taken before?

3         A      Yes.

4         Q      So you know the general process.  I

5    will be asking you questions and I will give you

6    time to respond.  And you know it's important for

7    the court reporter because she can only take one

8    of us down at a time --

9         A      Yes.

10        Q      -- to let me finish and then I will

11   try to do the same and let you finish your answer.

12   Try not to interrupt each other.  That kind of

13   happens in normal conversation.

14               Okay.  This -- we're taking your

15   deposition today under oath.  Ms. Zahn is going to

16   put you under oath in just a moment, and that's

17   just like sworn testimony in court.

18               Do you understand that?

19        A      Yes.

20        Q      Okay.

21               MS. NORTH:  And I turn it over to

22   Ms. Zahn.

23               THE COURT REPORTER:  I already

24   swore him in before we started.

25               THE WITNESS:  Yes.



1                MS. NORTH:  Oh, you did?  I'm

2    sorry.  I completely blanked out on that.

3    BY MS. NORTH:

4         Q      All right.  You have been placed

5    under oath.

6                So, Mr. Carman, are you taking any

7    medications today that could affect your

8    testimony?

9         A      No.

10        Q      Could you just state your full name

11   for the record?

12        A      Mark, middle initial L, Carman,

13   that's C-a-r-m-a-n.

14        Q      Okay.  And your address, sir.

15        A      I will have to spell this out.

16        Q      Okay.

17        A      Use the abbreviation KM8 National

18   Highway Barangays, which you can use BRNG,

19   Bonifacio, Surigao City, S-u-r-i-g-a-o, City,

20   Philippines, postal code 8400.

21        Q      Do you have an address in the

22   United States?

23        A      Not anymore.

24        Q      So this is the only address for

25   yourself?



```
 1          A       Yes.

 2                  I have an emergency address, if you

 3   will, with my son in Tennessee, but that's just

 4   like for if I needed something from my USA bank

 5   somewhere, but I don't use the address.

 6          Q       Okay.

 7                  All right.  I just returned from

 8   the Philippines.

 9          A       You did?

10          Q       That's an amazing country.

11          A       Yes.

12          Q       How long have you lived there?

13          A       When I left here -- we moved there

14   in August, so I took a few months to get things

15   together.

16          Q       Okay.  And are you living with

17   anyone there?

18          A       Yes.

19          Q       Okay.  And who is that?

20          A       My wife.

21          Q       All right.  And who is your current

22   employer, if anyone?

23          A       Retired.

24          Q       All right.  Mr. Carman, have you

25   ever filed a similar wage and hour lawsuit against
```



1    any other employer?

2          A        No.

3          Q        Have you talked to anyone about

4    this deposition today?

5          A        No one other than my counsel, a

6    couple of the co-litigants, we've talked about the

7    fact that it's -- or the one co-litigant that I

8    know of and family members, but no other person in

9    a professional authority.

10         Q        Okay.  And what did you talk to

11   Mr. Marc Gonzalez about?

12         A        The fact that we were having the

13   deposition and that I hadn't spoken to him since I

14   left the country and that.  That's just about it.

15         Q        Okay.

16         A        The conversation was probably three

17   minutes long.

18         Q        And so you didn't talk about the

19   actual substance of your lawsuit, the allegations

20   and what you were going to say today or not say,

21   anything like that?

22         A        Not about testimony.  We talked

23   about the substance months back, and that hasn't

24   changed, so we didn't really have a reason to

25   discuss all that.



1           Q       Okay.  And so what did you talk to

2    him about months back, the last time you talked to

3    him, with regard to this lawsuit?

4           A       I -- when I started here, when I

5    was still working, I guess you'll say part time, I

6    told him, I said, The way they are doing this is

7    not within the law, it's not correct, and I

8    told -- everybody knew that that was my position;

9    that as people being paid hourly, we're not

10   contractors.  And I tried to make that case many

11   times.

12                  So we've talked about that over

13   time.  I mean, we were friends, so we talked about

14   it.  We were co-workers.  We talked about it.

15                  So, basically, the entire essence

16   of the case.

17          Q       Okay.  And did you talk about,

18   after he had left and after you had left

19   employment and providing services for the

20   Authority, that you all would file something

21   against the company or...

22          A       I didn't talk to him saying that we

23   would.

24          Q       Okay.

25          A       I told him that I did.



```
 1          Q       Okay.
 2          A       No, I don't think I told him I did.
 3   I think he found out through a letter from the law
 4   firm.
 5          Q       Okay.
 6          A       I don't think I talked -- because I
 7   didn't talk to him the entire time I was in the
 8   Philippines.
 9          Q       Okay.  When was the first time that
10   you provided services for the Authority, do you
11   remember?
12          A       I want to say June of 2021.
13          Q       And how -- go ahead.
14          A       Or July.  It was either June or
15   July, I'm not sure.
16          Q       Okay.  And how did you come in
17   contact with the Authority such that you engaged
18   in this relationship?
19          A       They ran an advertisement on
20   Indeed.
21          Q       Okay.
22          A       Posted it as an hourly wage
23   position.  I responded.  I was interviewed.
24          Q       Do you remember with whom you
25   interviewed?
```


ZAHN
COURT REPORTING
www.zahncourtreporting.com

1          A        Keyond Gorley.

2          Q        Okay.

3          A        And then a second interview with

4     Mr. Bland, and others were in the room.

5          Q        Okay.  And how was the offer to

6     provide services to the Authority made to you?

7          A        You mean in writing or verbal?

8          Q        Right, correct.

9          A        It was verbal.

10         Q        Okay.  And do you recall what that

11    offer was?

12         A        It initially was $19 per hour.

13         Q        Okay.

14         A        And then it, I want to say within a

15    week or two, it was $20 an hour, and then it went

16    to $22 an hour.

17         Q        Okay.  Did you actually start

18    working at 19 or --

19         A        Yes, ma'am.

20         Q        Okay.

21         A        I believe my first paycheck was at

22    19.  I think so.

23         Q        Okay.

24                  All right.  So over a short period

25    of time it increased to $22 per hour?



```
 1          A       Yes.

 2          Q       And was that the amount per hour

 3   that you agreed to be paid?

 4          A       Yes.

 5          Q       Until the end of your services?

 6          A       Yes.

 7          Q       Okay.  When you worked by the hour.

 8          A       Right.

 9          Q       Okay.  Did they have other security

10   guard officers providing the same services when

11   you first engaged with them?

12          A       No.

13          Q       So you were the first security

14   guard officer providing security for them?

15          A       No, but with a qualification.

16          Q       Okay.

17          A       There was a captain from the

18   Sheriff's Department that had been dismissed from

19   the Sheriff's Department and he was working there,

20   and I'm told they were paying him and -- through

21   the -- I was told when I went to work there he was

22   getting paid as an off-duty police officer,

23   because they were getting paid much more per hour

24   than we were.

25          Q       Okay.  And that brings me to your
```



1    work experience.

2                    Can you describe your work

3    experience for me prior to joining the Authority?

4         A       Well, I was with the Virginia

5    Department of Corrections as a full-time employee.

6         Q       Okay.

7         A       My work experience prior to that

8    was I've had reserve credentials in some capacity

9    since I left full-time police work back in the

10   '80s.

11        Q       Okay.

12        A       I started off as a Norfolk police

13   officer, but I ended up going to Nashville as a

14   paid song writer.

15        Q       Okay.

16        A       And I worked there, but I always

17   kept my credentials there and worked in a reserve

18   capacity.

19                    So my -- my career was primarily in

20   the music business from about 1989 --

21        Q       Okay.

22        A       -- until...

23                    I got a Grammy nomination in 2014.

24        Q       Okay.

25        A       And I said I think I'm going to



1    retire right there with the belt --

2            Q       Right, I don't blame you.

3            A       -- because I was getting obsolete.

4    So I went back to my first love, which was law

5    enforcement --

6            Q       Okay.

7            A       -- and worked in the Department of

8    Corrections.

9            Q       Okay.  So you joined the Virginia

10   Department of Corrections what, 2014/2015?

11           A       No.  Actually I want to say January

12   of 2016, I believe.

13           Q       Okay.  And you said that was a

14   full-time position?

15           A       Yes.

16           Q       Okay.  And that was --

17           A       When COVID came, it was a little

18   more than full time.

19           Q       Yeah.

20                   So when you first started providing

21   services for the Authority in June of -- or July

22   of 2021, were you still full time employed with

23   the Virginia Department of Corrections?

24           A       Yes.

25           Q       Did they know that you did this



1   work on the side?

2          A       Yes.  I had -- we had to fill out a

3   paper to get authorization.

4          Q       Okay.  So it was technically part

5   time on the side that you provided services to the

6   Authority?

7          A       That's correct.

8          Q       Who was your supervisor at the

9   Virginia Department of Corrections?

10         A       I guess I would say the warden.

11         Q       Okay.  And who was that?

12         A       That's interesting.  I can't

13  remember her name.

14                 She had gotten married, and I

15  can't -- I can't remember her name -- Watson.

16  Gordon Watson.

17         Q       And where was this located?

18         A       It was initially at St. Brides,

19  which is in Chesapeake.

20         Q       And that's the location you worked

21  at even though you were providing part-time

22  services at the Authority?

23         A       That's correct.

24         Q       Okay.  Did you provide security

25  services for any other entity other than the



```
1    Authority?

2         A       No.

3         Q       Have you ever?

4         A       Not that I recall.

5                 I guess back when I was a full-time

6    policeman, yeah, I worked part time off duty

7    downtown in grocery stores and ball games, but

8    that -- but not as a security guard, no.

9         Q       What would that be -- in what

10   capacity did you work those jobs?

11        A       As an off-duty policeman.

12        Q       Okay.  How long were you a

13   policeman?

14        A       About four years full time.

15        Q       All right.  With Norfolk; right?

16        A       Um-hum.

17        Q       Okay.  So when you first provided

18   services to the Authority in June or July of 2021,

19   you were the only security officer at the time

20   providing those services; right?

21        A       No.

22        Q       Okay.  Who else was here?

23        A       Marc Gonzalez and I started the

24   same day.

25        Q       Okay.
```



```
 1          A       The captain I referred to a little

 2   while ago, Riddick, was already on board.

 3          Q       Okay.

 4          A       Keyond Gorley was the supervisor

 5   and was on board.

 6          Q       And Captain Riddick, did you know,

 7   did he provide full-time or part-time services, if

 8   you know?

 9          A       I don't know.  I mean, I've been

10   told --

11          Q       Right.

12          A       But of my own knowledge, I don't

13   know.

14          Q       Okay.  So when the Authority first

15   retained you, they did retain you as an

16   independent contractor in June or July of 2021;

17   right?  That was your understanding?

18          A       It was not my understanding.

19          Q       Okay.

20          A       But I accepted it when it was told

21   to me later that they weren't going to hold out

22   taxes and all that, because at that point it was a

23   part-time job, but it quickly turned into a lot of

24   hours.

25          Q       Okay.  How long did you provide
```



1    part-time work to the Authority, if you remember?

2           A       Maybe two weeks.  And probably less

3    than that because of the way the scheduling would

4    come down.

5           Q       Okay.  So about how many hours did

6    you start with?

7           A       Well, our schedule at the

8    corrections department, we worked two days one

9    week, five days the next week.

10          Q       Okay.

11          A       So on the two-day weeks, I might

12   work 50 hours or more for the Authority and then

13   on the other days it would be 20, 30.

14          Q       Okay.  So it depended on your,

15   first and foremost, your schedule with the

16   Virginia Department of Corrections, then --

17          A       Yes, at first.

18          Q       Okay.

19                  -- and then, depending upon what

20   you had to work in that job, you knew what your

21   availability was to provide services for the

22   Authority?

23          A       At that point, yes.

24          Q       Okay.  And you -- for about how

25   long?



1          A       I got promoted in July to

2    lieutenant.

3          Q       Okay.

4          A       Transferred to Sussex.

5          Q       In which job?

6          A       Correction.

7          Q       Okay.

8          A       With a transfer to Sussex.

9          Q       Okay.

10         A       I told them I was not going to be

11   able to work here any longer --

12         Q       Right.

13         A       -- because I couldn't make that

14   drive and work there.  So that's when the offer

15   was made for me to come on full time.

16         Q       Okay.  Was this in about January of

17   2022 or February 2022?

18         A       No.  That was July of 2021.

19                 And then in February I resigned

20   from the Department of Corrections based on

21   full-time employment here, with benefits, and be

22   able to keep my VRS, is what I was told.

23         Q       Okay.  So you got promoted and

24   transferred to Sussex with the Virginia Department

25   of Corrections about when?



1          A       Well, the actual paper -- the

2     actual transfer and the promotion all took place I

3     want to say July 30th or 31st.

4          Q       Okay.  Of 2021?

5          A       Of 2021.

6          Q       Okay.

7          A       We had started in June or July,

8     whatever it was, and then quickly I got the

9     opportunity to be promoted and drive 65 miles to

10    work, and it was thrown out to me, Hey, if you

11    don't -- if you stay here, we'll put you on full

12    time.

13         Q       Okay.  And so it sounds like it

14    took about not quite a month but almost a month

15    for that to happen?

16         A       No.  I resigned I believe it was

17    August 18th, so --

18         Q       I thought you said 21st.

19         A       -- roughly 18 days.

20         Q       Okay.  So August 18th or so you

21    resigned from the Virginia Department of

22    Corrections?

23         A       Effective that date, yes.

24         Q       Okay.  Mr. Carman, I'm going to

25    hand you some documents, and just bear with me



```
 1    because I'm going to walk around and hand them to

 2    you.

 3              A      Okay.  Sure.

 4              Q      Okay.  First let me put a label on

 5    it.

 6                     (W-9 marked as Carman Exhibit

 7                     Number 1)

 8                     MS. NORTH:  That's for you and

 9    counsel.

10                     And let me give you a second one

11    while I'm here.  We'll talk about that next.

12                     THE WITNESS:  I have Marc

13    Gonzalez's in my package as well.

14    BY MS. NORTH:

15              Q      Yeah, I'm sorry.

16              A      That's okay.

17              Q      Sometimes they just come together

18    like that.

19              A      That's fine.  Just letting you

20    know.  I didn't know if it was a mistake.

21              Q      I appreciate it.

22                     Okay.  What I've handed to you as

23    Carman Exhibit 1 is a copy of a W-9 form; correct?

24              A      Yes.

25              Q      Is that something you completed and
```



1   submitted to the Authority around June 17, 2021?

2          A       It is.

3          Q       Okay.  And is that your signature,

4   sir?

5          A       It is.

6          Q       All right.  And do you understand

7   what a W-9 form is?

8          A       I do.

9          Q       So it's meant for nonemployees, is

10  that correct, so that you can get paid as a

11  vendor?

12         A       I'm not that familiar with the tax

13  code if that's the only thing, but that would be

14  my understanding of it.

15         Q       Okay.  Just trying to find out if

16  you understood that and what this form was for so

17  that you could get paid as an individual

18  contractor, not as an employee, which would be a

19  W-4 form.

20         A       Sure.

21         Q       Does that make sense?

22         A       Yeah.  I mean, if you're not in

23  that line of work, it's -- the line gets blurred,

24  but, yes.

25         Q       Okay.



1          A       I know what that is.

2          Q       Okay.

3          A       I do now.

4          Q       And can you look at the second

5     document that we've entered as Carman Exhibit 2.

6          A       Um-hum.

7                  (Payment Enrollment Form, three

8                  pages marked as Carman Exhibit

9                  Number 2)

10    BY MS. NORTH:

11         Q       Is that your signature dated

12    6/17/21?

13         A       It is.

14         Q       Okay.  And it says Vendor Payment

15    Enrollment Form; correct?

16         A       Yes.

17         Q       And, again, that would just support

18    that you were going to be paid as a vendor by the

19    Authority; would that be fair to say?

20         A       That would be fair to say.

21         Q       Okay.  And is this your banking

22    information on the second page?

23         A       It is.

24         Q       Okay.  And you provided that

25    information to the Authority?



1        A      I did.

2        Q      Okay.  Mr. Carman, is it fair to

3  say that you were paid directly by the Authority

4  every two weeks?  Do you recall that?

5        A      On the normal payroll cycle, yes.

6        Q      Okay.

7        A      That would be every two weeks.

8        Q      Okay.  And tell me how you

9  submitted time to the Authority so that you could

10  get paid for your hours worked.

11        A      We were required to complete a

12  timecard showing the hours worked.

13        Q      Okay.  Tell me what that timecard

14  looked like.

15              And they provided it to you?

16        A      Keyond Gorley gave us an Excel

17  sheet for us to write in our time, and we did

18  that.  And I just went ahead and typed it up

19  because it was easier for me to keep records of it

20  for myself to save what I turned in.

21        Q      Okay.

22        A      And then we would give those to

23  Keyond Gorley.

24        Q      Okay.  So when you said an Excel

25  sheet, was it a printout of like --



```
1          A      Yes.

2          Q      Okay.

3          A      With the grids.

4          Q      Okay.

5          A      And it said hours, you know, time

6    in, time out, hours worked; yes.

7          Q      Okay.  But you decided to type it

8    up yourself for recordkeeping purposes and so

9    could you read it and turn it in?

10         A      Yes.

11         Q      Okay.  Did they dispute --

12         A      I gave it to Keyond for him to

13   approve it.

14         Q      Okay.

15         A      I turned it into an Excel form

16   because I said, This looks sloppy, so...

17         Q      Okay.  So did they dispute with you

18   how you turned it in?

19                They just wanted some recording of

20   your hours worked, right, and your time in and

21   time out?

22         A      I never heard any dispute about it.

23         Q      Okay.  And did you submit all your

24   hours worked when you provided services to the

25   Authority the whole time you provided services?
```



1          A        Not after I went on salary.

2          Q        Okay.  So before you went on

3     salary, did you submit to them all the time that

4     you worked?

5          A        Yes.

6          Q        And did you get paid either 19, 20

7     or $22 an hour for all that time?

8          A        Straight time, yes.

9          Q        Straight time.

10         A        Yes.

11         Q        So you got all your straight time.

12         A        I had no question with my pay --

13         Q        Okay.

14         A        -- on that regard.

15         Q        Okay.

16         A        And I will say this.  If there ever

17    was a discrepancy with myself or the other people,

18    it was a matter of addressing it, and it -- and

19    getting paid what was due was never a problem in

20    that regard.

21         Q        Okay.  And when you got the payment

22    from the Housing Authority, you noticed, correct,

23    that there were no payroll taxes or anything

24    deducted therefrom; right?

25         A        Yes.



1      Q      And that was in keeping with the

2   Authority's -- at least the Authority's treatment

3   of you as an independent contractor; right?

4      A      I wouldn't know what their

5   reasoning for it was.  It would be in line, I

6   guess, with that.

7      Q      Okay.  So to the -- to your

8   knowledge, are you claiming any unpaid wages for

9   the time when you weren't put on salary and

10   employed with the Authority as a W-2?

11      A      You mean hours I worked for which I

12   was not compensated?

13      Q      Are you saying there are any hours

14   that you worked that you weren't compensated for?

15      A      No.

16      Q      Okay.  What is it specifically that

17   you are alleging with regard to any wages you

18   weren't paid?

19      A      Well, when I went on salary, I was

20   told to don't -- to only turn in 40 hours.

21      Q      Okay.

22      A      Regardless of how much time I

23   worked, only do 40 hours.

24      Q      Okay.  But before that, if you

25   worked 50, 60, whatever hours, you recorded it and



1    you turned it in and you got paid for it; right?

2         A      Yes.  No dispute on the -- on

3    calculating the hours correctly.

4         Q      Okay.  Did you understand,

5    Mr. Carman, that as an independent contractor,

6    when you provided part-time services and

7    especially when you worked for the Virginia

8    Department of Corrections, that you weren't

9    entitled to overtime pay during that time period?

10        A      I understood it, but that's why I

11   complained about it all the time.

12        Q      Okay.

13        A      It wasn't right and it wasn't fair.

14        Q      Okay.

15        A      And, yes, I -- yes, I understood

16   it, but that's why I complained about it from the

17   very beginning.

18        Q      Okay.  So what was it that you

19   thought was unlawful about you not getting

20   overtime pay for the time when you provided

21   part-time services and you were employed with the

22   Virginia Department of Corrections?

23        A      If I worked 60 hours in a week at a

24   grocery store part time, they would pay me

25   overtime.



1          Q       Okay.  That's if you were employed

2    by the grocery store; right?

3          A       Yes.

4          Q       Okay.  What if you were an

5    independent contractor, did you understand that as

6    an independent contractor you're not entitled to

7    the overtime?

8                  I'm just asking what you

9    understood.

10         A       Well, from my -- I understood this.

11   I wanted to get paid, but I also understand that

12   they were supposed to be -- that we were supposed

13   to be employees the way they were working us.

14         Q       And why did you -- go ahead.

15         A       We were being directed by a boss.

16   We were being directed by emails and by -- what to

17   do with a posted schedule.  We were told what time

18   to come, processes and procedures, use of their

19   vehicles.  We had no authority to make any kind of

20   decisions about anything to do with the operation.

21   We had no ability to hire and fire.  We -- we were

22   treated just as employees and were referred to as

23   employees.

24         Q       Okay.  So when you say you were

25   directed by a boss, who was your boss?



```
 1          A       Keyond Gorley and Edward Bland.
 2          Q       Okay.  And what kind of directions
 3   would they give you about being a security guard?
 4          A       Everything.
 5          Q       Okay.  I need specifics.
 6          A       Don't talk to police about
 7   anything --
 8          Q       Okay.
 9          A       -- without it going through Keyond
10   Gorley.  Don't do this, do that.  It would be
11   like, Patrol this area, don't patrol that area.
12          Q       Yeah.
13          A       Report this.  Go out and
14   investigate that.  We had a shooting; Go out and
15   investigate that.  We had a, you know, a
16   destruction of property; Investigate that.
17          Q       Did you have to do a daily report
18   after each shift?
19          A       Yes.
20          Q       And what did that consist of?
21          A       The details of what transpired
22   during the shift.
23          Q       Even if nothing transpired, nothing
24   happened?
25          A       No significant events.
```



1        Q       Okay.  And who did you turn that in

2   to?

3        A       Initially Keyond Gorley.

4        Q       Okay.

5        A       When he left, we turned it in to

6   Mr. Bland.

7                And then when I took over, I was

8   directed to turn those in to Valerie Jenkins or

9   Alisa Winston or both, and I just copied everybody

10  on it.

11       Q       Okay.

12               All right.  And did they give you

13  the forms and everything to write these daily

14  reports on and incident reports and investigative

15  reports?

16       A       It was just an -- yeah, just an

17  end-of-shift report; sent an email.

18       Q       Okay.  So they didn't give you a

19  form.  You just typed up what happened and sent

20  it?

21       A       They told us what they wanted on

22  it.

23       Q       Okay.

24       A       But we took it a little further and

25  we would include pictures because it was better



```
1    for us to be able to show what the situation was.

2    Instead of just writing a paragraph --

3         Q       Right.

4         A       -- we would include pictures

5    incident by incident.  It just evolved into that.

6         Q       Okay.

7         A       And they wanted that.  They -- the

8    first time they saw that, they said, Oh, yeah,

9    let's do this.

10        Q       Okay.  So based on your training

11   and skills as a police officer and your experience

12   as a Virginia Department of Corrections officer,

13   did you just do that because you knew that's what

14   should be done and the Authority adopted what you

15   brought to them --

16        A       No.

17        Q       -- or did they give you forms to

18   use?  Tell me.

19        A       Well, initially -- I think I've got

20   an email on it -- but it was -- it had letterhead

21   and then it said End of Shift Report --

22        Q       Okay.

23        A       -- and then a blank spot.

24        Q       And then that's what you completed?

25        A       That's what we were told to do.
```



1          Q       When you were first retained to

2    provide services to the Authority, did they

3    provide you with any training on how to be a

4    security guard?

5          A       No.  They required us to obtain

6    training and give documents.  They trained us how

7    to be a security guard at the PRHA, at the

8    Authority.

9          Q       Okay.  So they trained you on how

10   to be a security guard for them.

11         A       Yes.

12         Q       What training did you go through?

13         A       Keyond Gorley walked us through

14   from these are where the properties are to these

15   are the forms you use for a ban notice, like if

16   someone's banned, these are the forms you use to

17   report property damage.  This is the process,

18   procedure.

19         Q       Okay.

20         A       Basically, you know, this is the

21   camera system.

22         Q       Okay.

23         A       This is how you operate the camera

24   system.

25         Q       But did they teach you on how to be



1   a security guard, like what it's like to patrol

2   and use of force, things like that?

3            A       No.   They gave directives on what

4   they wanted for use of force and not for use of

5   force.

6            Q       Okay.  Did you know of any security

7   guard providing services that didn't have some

8   kind of law enforcement background that worked for

9   the Authority during the time you did?

10           A       Yes.

11           Q       Okay.  Do you remember who?

12           A       All of them except Gonzalez.

13           Q       So all of them, they didn't have

14  any law enforcement experience?

15           A       Just security guards.

16           Q       Okay.

17           A       One of them had been a bouncer that

18  Gorley hired and he had never had any kind of

19  training or anything like that.  But the -- the

20  other people were -- they had license because that

21  was the way they ran the ad, you had to have a

22  license, you had to be licensed by the DCJS to

23  perform as a security guard.

24           Q       Okay.  For the position that you

25  applied for as well?



```
 1          A       I don't remember.

 2          Q       Okay.

 3          A       I know that Marc Gonzalez got his

 4   license after he was hired.

 5          Q       Okay.

 6          A       And I know that I got my

 7   appointment on behalf of the PRHA as a special

 8   conservator of the peace in Virginia after I was

 9   employed here.

10          Q       Is that the appointment or license

11   you're talking about to be a special conservator?

12          A       No.

13                  There are various steps.

14          Q       Okay.

15          A       There are various categories of

16   license.  There's unarmed, armed, armed with

17   arrest authority.  Then if you're armed, you have

18   to have the endorsements for all the various

19   weapons.

20          Q       Correct.

21          A       Yes.

22          Q       Okay.  So I'm sorry.  Are you

23   saying that the Authority required a specific

24   license by the DCJS for everyone who was a

25   security guard or they didn't?
```



1          A       Well, as far as I understood, they

2   required it for everyone.

3          Q       Okay.

4          A       I wasn't in that capacity, so I'm

5   saying it's my understanding they did.

6          Q       Okay.

7          A       As would if you went to work

8   anywhere else, in order to have arrest authority,

9   you have to be cleared by the DCJS even if you're

10  a full-time police officer.

11         Q       Right.

12         A       You have to have a license with the

13  DCJS, so yes.

14         Q       Okay.  So do you know, for

15  yourself, after you got the conservator of the

16  peace certification, did you have arrest

17  authority?

18         A       I did.

19         Q       Okay.

20         A       I had arrest authority as an armed

21  security with arrest authority.

22         Q       Okay.

23         A       But then we had a little more

24  comprehensive authority on the PRHA property which

25  gave us essentially police powers on the property



1   and mine was extended one mile beyond the

2   property.

3           Q       Okay.

4           A       I believe Marc Gonzalez's was two

5   miles beyond the property, but mine was extended

6   one mile beyond the property.  He just got his

7   after I got mine, so...

8           Q       Go ahead.

9           A       And on the application, you know,

10  we didn't sign that.  We didn't apply that.

11                  The applicant is the Portsmouth

12  Redevelopment and Housing Authority on the

13  document.

14          Q       I was going to ask you that.

15                  Who applied and who paid for that?

16          A       That was all done by the -- by --

17  the application, I don't think there is a fee for

18  it.  I think you just submit it to the Court.

19          Q       Okay.

20          A       And you fill out that and then...

21          Q       I thought you had to go to classes

22  and --

23          A       You have to have the classes, but I

24  think all of it for mine and Gonzalez's was exempt

25  because of our prior experience.



```
 1           Q       Okay.
 2           A       See, I was already DC certified --
 3    DCJS certified in firearms and handcuffing and
 4    that sort of stuff --
 5           Q       Okay.
 6           A       -- so we didn't have to do
 7    anything.
 8           Q       Okay.  That makes sense.
 9                   But as far as applying it and
10    sending it to court and getting their approvals,
11    you're saying the Authority did that.  You did not
12    do that in your own capacity?
13           A       Correct.  It says right on the
14    documents that the applicant is the Portsmouth
15    Redevelopment Housing Authority.
16           Q       Okay.  And tell me about the
17    schedule.
18                   Who made the schedule?
19           A       Keyond Gorley.
20           Q       Okay.
21           A       And after he left, Marc Gonzalez.
22           Q       All right.  And how did you find
23    out about what times you had to work?
24           A       We would get an email with the
25    schedule on it.
```



1          Q        Okay.

2          A        And it would also be posted inside

3     our office.

4          Q        All right.  And what did you have

5     to do in order to excuse yourself if you had a

6     conflict because of whatever either personal or

7     work reasons?

8          A        I would have to call Keyond Gorley

9     or Marc Gonzalez.  But I had already left -- I'm

10    pretty sure I had already left the Department of

11    Corrections before Gonzalez took over -- oh, yeah,

12    I know I was -- I know I did, yeah --

13         Q        Okay.

14         A        -- because I remember when Gonzalez

15    took over.

16         Q        Did the Authority provide you with

17    any equipment --

18         A        Yes.

19         Q        -- for you to be a security guard?

20         A        Yes.

21         Q        Okay.  What equipment?

22         A        Radios, body cameras --

23         Q        Okay.

24         A        -- automobiles, fuel for the

25    automobiles, office equipment, paper stock.



1          Q       Okay.  What about --

2          A       Placards for our bulletproof vests

3     that said "PRHA" on them.

4          Q       What about any weapons?

5          A       We were -- we had to provide our

6     own weapon.

7          Q       Okay.  Flashlights, billy club or

8     anything like that?

9          A       Nh-huh, they didn't provide any of

10    that.  You had to provide that yourself.

11         Q       Okay.  And what about a shirt or a

12    uniform, did they --

13         A       They did, they provided a shirt, a

14    golf shirt that had the "PRHA" on it.

15         Q       Okay.  Did you pay for that --

16         A       No.

17         Q       -- or did they?

18                 Okay.  All right.  Were you subject

19    to any discipline or writeups during the time you

20    provided services?

21         A       No, not until after I was on

22    salary, and then it was like I was a target, so...

23         Q       Did you discipline any other

24    security guards while you were nonsalaried?

25         A       I didn't have the authority.



1    Didn't have the capacity to do that.

2              Q       Okay.  And you said you reported to

3    Keyond Gorley for a while and then Marc Gonzalez?

4              A       Yes.

5              Q       Okay.  So what do you mean by

6    "reported to"?  What did you have to do with

7    regard to reporting to them?

8              A       Well, we would give our

9    end-of-shift reports --

10             Q       Okay.

11             A       -- to Gonzalez.  We would -- he

12   would do the scheduling.  He would be in the

13   position of being the acting director, so he --

14   everything.  Everything we did --

15             Q       Okay.

16             A       -- would be reported to the person

17   either -- it was Keyond Gorley until he left, and

18   then there was nobody in that position, so

19   Gonzalez being the senior guy in our pecking order

20   there just took over the role.

21             Q       Okay.

22             A       Somebody has to be setting the

23   schedule, and he was the guy told to do it.

24             Q       How many people did Gorley, when he

25   was there, supervise or monitor, oversee?  About.



1          A        About five.

2          Q        What about Mr. Gonzalez?

3          A        About the same.

4          Q        Okay.  And so how was it determined

5    who would patrol which properties?

6          A        Well, we were told where to patrol.

7          Q        Okay.

8          A        Sometimes it would come from one of

9    the property managers who, you know, like I forget

10   what her capacity is, but Valerie Jenkins was like

11   over the operational things, you know, the

12   day-to-day stuff of all the properties.

13                  Sometimes it would come from

14   Mr. Bland himself, sometimes it would come from

15   Alisa Winston, which I believe was his deputy.

16                  So it was all coming from the top

17   as far as, you know, if there were -- a lot of

18   times it was normal patrol, just go do it, and

19   then a lot of times there were this specific

20   situation, Hey, we received an email, we received

21   a tip, we received a complaint, et cetera,

22   et cetera.

23         Q        Okay.  Did you have access to

24   email?

25         A        Yes.



1          Q       You said you did.

2                  Okay.  And did you have an

3    Authority email or did they use your personal

4    email to communicate with you?

5          A       Well, I used my personal email to

6    communicate until -- I think until I went on

7    salary.

8          Q       Okay.

9          A       But we did have ID cards and stuff

10   issued by the Authority.

11         Q       And when was that?  Back in June or

12   July of 2020?

13         A       Yeah, when we first started.

14         Q       Okay.  And did it have the

15   Portsmouth Authority credentials on it?

16         A       Yeah, it had the logo and all that;

17   yeah.

18         Q       Did you have to have a

19   certification in CPR or anything like that?

20         A       We didn't have to.

21         Q       Okay.  Let me get you the next two

22   documents.

23                 Mr. Carman, do you recognize what

24   we've entered as Exhibit Number 3 dated

25   February 22nd, 2022?



1          A       I do.

2                  (Offer of Employment, two pages

3                  marked as Carman Exhibit Number 3)

4    BY MS. NORTH:

5          Q       Okay.  Is that your signature on

6    the second page?

7          A       Yes.

8          Q       And it says that the Portsmouth

9    Redevelopment and Housing Authority is pleased to

10   extend you an offer of employment for the position

11   of security program and risk management officer at

12   an annual salary of $48,620; is that right?

13         A       That is.

14         Q       So does this refresh your

15   recollection on when you became full time employed

16   as a W-2 employee with the Authority?

17         A       It does.

18         Q       Okay.  And before this time, tell

19   me in what capacity you were working as far as

20   full time, part time, and what you were doing

21   before this, right before this time.

22         A       From August until this date --

23         Q       Okay.

24         A       -- I was working full time.

25         Q       Okay.  And what were you doing for



1  the Authority?

2          A       What we described previously in

3  this interview all the way up to here.

4                  We were doing basic patrol

5  functions, we were doing the normal day-to-day

6  things that that would require.  It would overlap

7  into property issues, because that was what the

8  whole job encompassed.  It wasn't just ensuring

9  the -- the criminal element; it was also about

10  safety and reporting, like if there were broken

11  windows and glass and un- -- unfit conditions,

12  things like that.

13         Q       All right.  And was Mr. Gonzalez

14  from August of 2022 until February of 2022 in that

15  supervisory capacity you talked about earlier?

16         A       I'm not sure when he left, but I

17  believe it was like right at that time, yes.  It

18  would have been -- because I moved right in right

19  after he moved out.

20         Q       Okay.

21         A       So it would have been February.

22  Whenever he left.

23         Q       Okay.

24         A       He was in that capacity until he

25  left.



1          Q       Did you take over that position, is

2     that --

3          A       Kind of like he did when Keyond

4     Gorley left.  I was the senior guy there, so it

5     was left up to me.

6          Q       Okay.  So when you were hired as an

7     employee in February -- on February 22nd, 2022,

8     you knew that was an employee, full time, and you

9     got your benefits and a guaranteed salary; right?

10         A       I knew it was and I knew how it got

11    there is because I had been telling him,

12    Mr. Bland, You promised to put me full time in

13    September, and you haven't done it, and I either

14    need a job or I'm going to go get one and I'm

15    going to file a lawsuit on you.

16         Q       Okay.  But you knew when you were

17    hired in February of 2022 that you were hired to

18    manage this department with a guaranteed salary

19    and the benefits that came along with that as

20    stated in this offer letter; right?

21         A       As stated in this offer letter,

22    yes.

23         Q       Okay.

24         A       I was -- I knew that, but I was

25    always -- the answer is yes.



1        Q       I understood that you were

2   complaining about it beforehand, but I'm just

3   trying to establish when you were hired --

4        A       I understand.  The timing is this

5   day.

6        Q       Okay.  And I want to get an

7   understanding from you of what your job was.

8                You were to take over and to manage

9   the department and manage the other security

10  guards; right?

11       A       By this letter.

12       Q       Yes.

13       A       By -- I will say this.  My

14  testimony will be that I signed this under duress.

15  I signed this because it says on the back that I

16  had until 5 o'clock to do it --

17       Q       Okay.

18       A       -- and I wouldn't have a job if I

19  didn't do it, if I didn't accept this.  And I

20  complained about it, I argued about it, but I

21  needed to have a job.

22       Q       Okay.

23       A       So, yes.

24       Q       So you just said you had bugged

25  Mr. Bland about doing this, and he gave it to you.



1              So why were you signing under

2   duress if it's what you wanted?

3        A     Because it wasn't near the amount

4   that I was supposed to get.  It was -- it was

5   nothing.  And, plus, he told me that this

6   (indicating) didn't mean anything; just to keep

7   doing what I was doing.  That's what he told me.

8        Q     Okay.

9        A     He said, This job description, you

10  don't need to do all that insurance stuff, you

11  don't do any of that stuff.  You just go keep

12  doing what you are doing.

13       Q     Okay.  So we will talk about what

14  you did then instead of the job description.

15             But just to be complete, if you

16  look at what we've entered as Exhibit Number 4, it

17  does say this was a job description for the

18  security program -- programs manager, which you

19  were given when you were offered this full-time

20  job in February 2022; right?

21       A     Yes.

22             (Classification Description, four

23             pages marked as Carman Exhibit

24             Number 4)

25



```
 1   BY MS. NORTH:
 2          Q      But Mr. Bland said you don't have
 3   to fulfill every single one of these duties; he
 4   just wanted you to do what you had been doing for
 5   the security guard department, right?
 6          A      That is correct.
 7          Q      So let's go back to the job that
 8   you were hired to do in February of 2022.
 9                 Are you -- are you testifying that
10   he guaranteed you some kind of other salary before
11   you signed this document?
12          A      Before I signed which document?
13          Q      The Exhibit Number 3.
14          A      The original doc- --
15          Q      Exhibit Number 3, the offer letter.
16          A      This document (indicating)?
17          Q      Yes, sir.
18          A      Mr. Bland had promised me back when
19   I said I was going to quit, I came into this
20   office and sat with him, and he said, We'll put
21   you on in September even if I have to put you in
22   on one of the maintenance worker slots because we
23   don't have that slot available, but I'll put you
24   on so you can get your benefits and get your VRS.
25          Q      Okay.
```



1          A        Didn't happen.  I kept on and on

2    and on about it.

3          Q        Okay.

4          A        Didn't happen.

5          Q        Okay.

6          A        Finally we get in there --

7          Q        Yeah.

8          A        -- and this comes out to a pay cut

9    of several thousand dollars a year based on what I

10   had been making at the hourly rate.

11         Q        Okay.  So it's not that he

12   guaranteed you a certain amount of money because

13   you were paid by the hour and that depended on the

14   hours you were working?

15         A        Oh, yes.  But I was told to keep

16   working the same hours but only turn in 40 hours.

17         Q        Okay.  So that's what I want to get

18   to.

19                  Do you understand as a manager when

20   you're paid an exempt -- I mean, when you are paid

21   an annual salary and you manage a team of people,

22   that you are exempt from overtime?

23         A        Depends on a lot of different

24   moving parts there.

25         Q        Okay.  But my question is, did you



```
1    have a basic understanding that when you're hired
2    at that level and guaranteed a salary, you are
3    expected to do the job no matter how many hours it
4    takes?
5          A      Nope.  I argued that point with
6    him.  I argued that point with him and said, No,
7    you can't just put somebody up to the threshold,
8    work them 70, 80, 90 hours a week, and then not
9    pay them overtime.
10               If you don't have decision-making
11   authority and hiring and firing authority and all
12   that, you're an hourly employee --
13         Q      Okay.
14         A      -- or you're not exempt -- not an
15   hourly employee; you're not exempt --
16         Q      Okay.
17         A      -- from overtime.
18               And that's the way I understood the
19   law, and I researched it thoroughly before I got
20   into all this.
21         Q      Okay.  So before -- when you signed
22   the February 22nd, 2022 letter, are you saying
23   that you did not have the authority to hire other
24   security guards for your team?
25         A      Absolutely not.
```



1        Q        Okay.

2        A        Even after I got this, I didn't.

3        Q        Okay.  Who hired them?

4        A        Ed Bland or Keyond Gorley before

5    that.

6        Q        Okay.

7        A        But Ed Bland had to approve

8    everybody.  They had to come in here and sit down

9    and talk to him.  He had to hire them.  We

10   couldn't hire anybody.  He had to hire them

11   directly.

12       Q        So I understand he had to approve

13   everyone's hire as an executive director.

14                But did you recommend anyone?  Did

15   you tell him, I want to hire this person and then

16   he approves it?

17       A        I personally never did, not one

18   person.

19       Q        So you didn't interview or talk to

20   any security guard candidates while you were in

21   this --

22       A        I interviewed a couple of

23   candidates based on -- I think I was just in on

24   the interview with Gonzalez and Keyond Gorley and

25   other people, but I don't think I directly



1    interviewed anybody.  I didn't need to hire

2    anybody.

3           Q      You didn't need anyone for your

4    team?

5           A      No.  It was the same people that

6    were there before.

7           Q      Okay.

8           A      And then he told me when we -- when

9    Gonzalez left, now we're down to me and three

10   others, and he said, No, you just keep doing the

11   same thing.  You just keep going what you're

12   doing.  Instead of it being Gonzalez and four

13   people, it was Carman and three people to do the

14   same job.

15          Q      Okay.

16                 Well, sometimes that happens.  A

17   lot of people have worked a lot of hours with

18   fewer resources in companies.  You know that's

19   happening; right?

20          A      Yes, ma'am.

21          Q      Okay.  But so when you were the

22   manager of the department, at first you're saying

23   you didn't need to hire anyone so no one was hired

24   technically during the time that you were the

25   manager after February 22nd, 2022; is that right?



```
 1   Nobody was hired as a security guard?
 2           A       No.  It was the same people.
 3           Q       Okay.  So... and then as time went
 4   on, a couple people left you just testified;
 5   right?
 6           A       Before I became the manager.
 7           Q       Okay.  But you said you went
 8   from -- did you --
 9           A       Keyond Gorley left and Gonzalez
10   left.
11           Q       Okay.  But did any security guards
12   other than yourself who weren't -- they were in a
13   managerial capacity.
14                   Did anyone else leave?
15           A       There was a guy that worked a
16   little while, maybe a couple weeks, named Billy
17   Hardy.
18           Q       Okay.
19           A       And then there was a guy Manny
20   Perez that worked a few weeks.
21           Q       Just here or there?
22           A       That's it.  That was way early on
23   in the deal.
24           Q       Okay.  We don't have to worry about
25   that.
```



1          A        That was way early on.

2          Q        All my questions right now are

3    after you signed the February 22nd, 2022 letter

4    where you became the manager of this department.

5    You didn't have to hire anyone because you had the

6    staff already in place, you're saying; right?

7          A        Correct.

8          Q        Okay.  And did you have the

9    authority to recommend someone be disciplined or

10   terminated if they messed up who was on your team?

11         A        It was made specifically clear to

12   me by Ed Bland I didn't have any authority to do

13   anything.  He gave me that to shut me up

14   (indicating).

15         Q        Okay.  So the whole time that you

16   managed the team of people providing security

17   services to the Authority, you're saying you

18   didn't feel like you had the authority to go to

19   him and say, So-and-so messed up.  We need to

20   write him up or terminate her.

21         A        Ma'am, as of the date of this, I

22   got an email that said I'm no longer to have any

23   contact with Ed Bland and I have to do everything

24   through Valerie Jenkins.

25         Q        Okay.  When was that?



1        A       Like the next day or so.

2        Q       Okay.

3                All right.  So, technically, you

4    reported to Valerie Jenkins after you signed that

5    document, Exhibit Number 3?

6        A       Yes.

7        Q       Okay.

8                All right.  Did you make the team

9    schedules after the February 22, '22 letter, 2022

10   letter?

11       A       Those schedules were submitted as a

12   recommendation to Valerie Jenkins, and she

13   approved it.

14       Q       Okay.  Did you communicate with the

15   team members on your team about the schedules and

16   where -- what to patrol, what properties to patrol

17   and, et cetera?

18       A       Yes.

19       Q       Okay.  Did the team members submit

20   any of the daily reports to you at the end of the

21   shift or end of the day?

22       A       They all reported to me at the end

23   of the shift and the end of the day.

24       Q       Okay.

25       A       Yes.



1          Q       Okay.   And then did you submit

2    whatever you submitted to higher level management

3    to Valerie Jenkins?

4          A       Yes.

5          Q       Okay.   Did you have to request that

6    anybody on your team be disciplined for any

7    wrongdoing or misconduct?

8          A       No.

9          Q       Okay.   Did you recommend that any

10   of them receive any kind of pay raise during the

11   time you managed them?

12         A       No.

13         Q       Did you have the authority to

14   recommend to Valerie that you thought someone

15   needed a pay raise?

16         A       No.

17         Q       So Valerie would just determine for

18   herself without any input from you if someone

19   needed a raise?

20         A       It never came up.   I wouldn't have

21   any idea.

22         Q       Okay.   Did you go through the

23   Portsmouth Authority's orientation for new hires

24   when you -- after you signed this letter?

25         A       Yes.



```
 1          Q        Okay.  And do you remember what
 2   that consisted of, what type of training that was?
 3          A        Handed me a booklet and said, Read
 4   this, sign here.
 5          Q        Okay.  Employee handbook?
 6          A        Um-hum.
 7          Q        And did you do that?
 8          A        Yes.
 9          Q        Okay.  Did they tell you you don't
10   need to record any hours at all for yourself?
11          A        No.  They told me that I had to
12   turn in 40 hours.  I asked the question, So then
13   what happens if I get called out at it 2 o'clock
14   in the morning because there's a shooting?
15                   Just turn in 40 hours.
16          Q        And how many people were on your
17   team after February 22nd?
18          A        Myself plus three.
19          Q        And who were the three?
20          A        Tenisha Stithe --
21          Q        Okay.
22          A        -- Kevin Perry and Nathaniel
23   Jackson.
24          Q        Was it the three of them until you
25   resigned?
```



```
 1            A       Yes.
 2            Q       And were each of those individuals
 3   full time or part time?
 4            A       They had been working the same kind
 5   of hours as everybody else.
 6                    But after this occurred
 7   (indicating), he put them all on the payroll, so
 8   to speak, giving them benefits and, et cetera, but
 9   cut their hours back to 33 hours a week.
10            Q       Okay.  So after -- when you started
11   managing them as a team in February of 2022, they
12   all worked about 33 hours or so a week?
13            A       That's what they were allowed to
14   work.
15            Q       Okay.  You understand that an
16   employer is allowed to determine the hours worked
17   by its providers of services or employees?
18            A       Yes.
19            Q       Okay.  And you've mentioned a
20   couple times or intimated that those three
21   individuals became employees, W-2 employees at
22   some time after you signed Exhibit 3 or
23   thereabouts?
24            A       Almost immediately.
25            Q       Okay.
```



```
 1            A       Within a day or two, as I recall.
 2            Q       Okay.  If one of your team members
 3   needed some time off, would they come to you and
 4   ask you first?
 5            A       I don't recall it happening, but --
 6   after I took over because they weren't getting
 7   enough hours anyway, so I don't -- I don't
 8   remember it happening.
 9            Q       Okay.  But if they needed to, would
10   they go to you first as the manager of the
11   department?
12            A       Perhaps, but they probably would
13   have just gone to Valerie.
14            Q       Without telling you or asking you?
15            A       Yes, because I was only in that
16   position as a quasi position.  That was made clear
17   to me.
18            Q       Okay.  But my question is, if you
19   made the schedules for them and they were
20   approved --
21            A       But I didn't make them anymore --
22   oh, okay.
23            Q       They were approved by Valerie
24   Jenkins.  You wrote them out, though, right?
25            A       It was the schedule and then that's
```



1   the schedule and it didn't change.

2          Q       Okay.

3          A       So...

4          Q       But you had to look at it and know

5   who was assigned to what property and what times.

6   You had to do that.

7          A       They were assigned to all of them.

8          Q       I'm sorry?

9          A       Everybody was assigned to all of

10  them.

11         Q       Okay.

12         A       Patrol them all.

13         Q       Okay.  But you got that shifts and

14  you looked at it before you would pass them on to

15  your people; right?

16         A       No.  It was printed one time and

17  just hung up; that's the schedule.

18         Q       And it never changed?

19         A       Not that I recall.

20         Q       Even your -- and that applies to

21  yourself as well?

22         A       Oh, mine was just all the time.

23         Q       Were you on that schedule that was

24  printed or not?

25         A       No.



1          Q       Okay.  So do you recall any of your

2     three team members having to come in late or leave

3     early for any reason?

4          A       Not after I took this position, not

5     that I recall.

6          Q       Okay.  So they were never late and

7     they never had to leave early, to the best of your

8     recollection?

9          A       Yeah, not that I recall.

10         Q       Okay.

11         A       Now, Nate was habitually 10, 15

12    minutes late.  But other than that, it wasn't

13    like, Hey, I need to have a day off or...

14         Q       Yeah, okay.

15         A       No.

16                 And if they needed something like

17    that, they just worked it out themselves.  They

18    would just say, Hey, I will work for you if you

19    will work for me.

20         Q       They didn't have to go through you

21    to make sure that was okay?

22         A       No, ma'am.

23         Q       Okay.  Let me get you the next

24    document here.

25                 So, Mr. Carman, is it your



```
 1    testimony that while these three people
 2    technically reported to you as nonmanagement level
 3    people in the security department, you did nothing
 4    to manage them --
 5          A      No.
 6          Q      -- in their day-to-day operations
 7    while they performed services?
 8          A      That is not my testimony.
 9          Q      Okay.
10          A      My testimony is that scheduling --
11          Q      Okay.
12          A      -- which you asked me about, I had
13    no control over it.
14          Q      Okay.
15          A      Hiring and firing, discipline, I
16    had no control over it.
17          Q      I mean, are you saying you didn't
18    have the ultimate say or are you saying that you
19    didn't have any -- you couldn't even give any
20    input whatsoever?
21          A      Oh, I could give input --
22          Q      Okay.
23          A      -- as any other employee could.
24          Q      Okay.  But somebody else made the
25    ultimate decision on those issues you just talked
```



1   about?

2          A      Yes.

3          Q      Okay.  How did you direct these

4   employees day to day then, on a day-to-day basis?

5   What direction did you give them?  How did you

6   manage them?

7                 Because you said -- you denied that

8   you didn't do anything at all, so I'm asking you

9   what you did do.

10         A      Well, we basically showed up, and

11  it was basically if they got into --

12                (talking over)

13         Q      They did what they wanted --

14         A      If they got in a situation where

15  they needed an investigation and it was out of

16  their category -- out of their league, I would do

17  that.

18                But it wasn't that they just did

19  what they want.  It's they knew what to do and did

20  what they were supposed to do.  They didn't need

21  somebody holding their hand all the time.

22         Q      Okay.

23         A      It was, Here's the schedule.  Show

24  up, do your job, do your reports.  That's it.

25         Q      Okay.  My question is did you do



1   anything to overlook their reports to make sure

2   that they filled them out?

3          A      Yeah.

4          Q      And they were done correctly?

5          A      They submitted them to me and I

6   would look at them.

7          Q      Okay.  And what if they needed help

8   with an investigation?  Could they come to you

9   first --

10         A      Sure.

11         Q      -- to seek guidance --

12                THE COURT REPORTER:  I'm sorry, can

13  I just ask to just -- I'm hearing both of you at

14  the same time.

15                THE WITNESS:  I'm sorry.

16                THE COURT REPORTER:  So I just --

17                THE WITNESS:  Yes, I'll wait.  I

18  apologize.

19                THE COURT REPORTER:  Perfect.

20  Thank you.

21                So I think I started to hear, What

22  if they needed help with an investigation...

23  BY MS. NORTH:

24         Q      -- could they go to you for

25  guidance?



1           A       Yes.

2           Q       Okay.  If they had any questions

3     about their day-to-day duties or responsibilities,

4     would they go to you first to seek help?

5           A       Maybe an opinion.

6           Q       Yeah.

7           A       But they would go directly to

8     Valerie, too, if they needed to.

9           Q       So there was no requirement for

10    them to run anything by you first?  They could go

11    directly to Valerie on anything related to their

12    jobs?

13          A       For the most part.  I mean, they --

14    there was really nothing official about the way it

15    ran from that point on.  It really wasn't...

16          Q       Okay.  So did you do anything to

17    help create any policies or procedures to put in

18    place with the department to help it run smoothly

19    or to help direct it in how it did business for

20    the Authority?

21          A       Yes.

22          Q       Okay.  Give me some examples.

23          A       I can't recall any right off, but

24    I'm one of those guys that I try to do process

25    improvement when I see things that are like out of



1    whack, I'll make a suggestion, say, Hey, why don't

2    we do this, why don't we try that, what do you

3    think about this, let's do that.

4                    Yes, so I did that kind of stuff.

5          Q       Okay.  Then you would work with

6    Tenisha, Kevin and Nathan on those things when you

7    had an idea on how to improve things?

8          A       Yeah, we would discuss it and then

9    discuss it with whomever it was necessary to

10   discuss it with.

11                   We had a lot of interaction with

12   the police after that.  The camera system, we had

13   gotten really good at using the camera system, and

14   so we would work closely with the police on a

15   couple -- specifically a couple shootings --

16         Q       Oh, okay.

17         A       -- a couple homicides that we were

18   able to use or cameras and track people back.

19                   So there was a lot of team-type

20   discussion, but it was not like I'm-the-boss;

21   you're-not type thing.

22         Q       So when you say you weren't the

23   boss, then who ran the department if you didn't

24   but you were hired to do it?

25         A       Essentially, technically, it would



1   be me.  In application, I had no authority.

2            Q       Okay.  Why do you keep saying you

3   had no authority --

4            A       Because Mr. --

5            Q       Wait, wait, wait.

6                    You don't have to have the ultimate

7   authority, but if you had significant input to

8   make recommendations to higher management on

9   anything related to a department you're managing,

10  that's what I'm talking about.  I don't mean

11  ultimate authority, yes or no you can do it or not

12  do it.

13           A       My opinion, my opinion is I have no

14  authority.

15           Q       Okay.  And tell me why based on

16  what I just described to you as being authority.

17           A       How far do you want me to go all

18  the way into it?

19           Q       Only since you signed the

20  February 22nd, 2022 letter.

21           A       Okay.  February 22?

22                    Prior to that, that Chevy Traverse

23  out there was a car for whoever was in this

24  position to have that car so that you could

25  respond in the middle of the night (indicating).



1          Q       Okay.

2          A       You would take that home.

3          Q       Yes.

4          A       It has emergency lights on it.

5                  It was taken from me.  I was not

6    allowed to have it.

7          Q       Okay.

8          A       That's one.

9          Q       Then you just had to use your own

10   car?

11         A       To respond, yeah.

12         Q       Okay.

13         A       But I wasn't allowed to turn in

14   fuel or mileage.

15         Q       Okay.  But that's not authority to

16   manage the department.

17         A       Okay.

18         Q       That's just some perks being taken

19   away.

20         A       I don't know what you're asking

21   me --

22         Q       Okay.

23         A       -- other than Ed Bland controls

24   everything here up to and including while I was

25   here, he had, from what I was -- learned,



1   terminated the HR director so there would be

2   nobody but -- that the employees could go to if

3   they had issues like I had.

4          Q       Okay.

5          A       So I'm just telling you, I had

6   my -- I had no teeth.  And I was no different than

7   anybody, other than he gave me that to try and

8   shut me up.

9          Q       Okay.

10         A       That's my position.

11         Q       Okay.

12         A       And that will remain my position.

13         Q       Okay.  And I understand to a

14  certain degree that you had issues with some of

15  the perks that may have existed before you took

16  over the manager position, a Portsmouth Authority

17  specific car wasn't available to you anymore, you

18  had to use your own, you couldn't submit for

19  certain mileage.

20                 But when it came to managing your

21  department, if you -- my question is, did you have

22  the authority to present Ed Bland or anyone else

23  in higher authority with ideas on how to change

24  policies and procedures in your department?

25         A       No more than the janitor.



```
1              Q       Okay.

2              A       And that's going to be my position

3      no matter how many times you ask it.

4              Q       I just want to make sure you

5      understand, because you just said you didn't

6      understand what I was asking you.

7              A       And I want to make sure you

8      understand my answer.

9              Q       Right.  Okay.

10             A       It was made clear to me I was

11     nobody.

12             Q       Okay.  So as a result of you being

13     told you were no one, you did nothing to manage

14     the three people on your team; right?

15             A       I showed up and I did my job, which

16     was to act like a security guard.

17             Q       Okay.  No management --

18             A       And then I did --

19             Q       -- at all of these three

20     individuals who reported to you.  None.

21             A       I mean, I didn't have the authority

22     to, ma'am.  I don't know how many times I'm going

23     to have to answer the same question and it's going

24     to be the same answer every time.

25             Q       Okay.
```



1          A       I had no authority.  It might be on

2   paper, it may be assumed, but I had no authority

3   to do anything after this date (indicating).

4          Q       So I guess what I'm struggling with

5   is you keep saying that, but you don't give me

6   examples.  And when I ask you things, your answer

7   is different, like, Yeah, I made some policy

8   changes.

9          A       No, I didn't say I made policy

10  changes.  I want that corrected in the record if

11  that's what you got.

12         Q       Yeah.

13         A       I have made suggestions --

14         Q       Okay, that's fine.

15         A       -- and then they were all turned

16  down and then I just quit making suggestions.

17         Q       Okay.  But you had the ability to

18  make suggestions; right?

19         A       If that's what you want the answer

20  to be, I will agree to it.

21         Q       Yes, that's what I want.

22         A       Okay.  That's the answer.

23         Q       I want to know whether you had the

24  ability to submit input on how to manage your

25  team.



1          A        Just like every other team member.

2          Q        Okay.  If you felt like you needed

3   to hire another team member for your team, did you

4   have the ability to ask --

5          A        Ma'am, I could ask --

6          Q        Hold on.

7          A        -- for a hundred thousand dollar

8   raise.

9          Q        Let me finish first.

10          A        Go ahead.

11          Q        Did you have the ability and were

12   you expected to make that request to higher level

13   management on what you wanted for your department?

14   Whether it was additional people, equipment,

15   supplies, money, hours, did you have -- were you

16   expected by management to let them know what you

17   needed to manage your department?

18          A        What answer do you want me to give

19   you so I can answer it?

20          Q        Whether you had the --

21          A        Well, I tried --

22          Q        Whether you had -- that was the

23   expectation was you were supposed to ask them

24   about them and -- ask about these things about

25   whether you could get it.



```
 1                    Now, whether you got it or not, I
 2      don't know.
 3                    I just want to know that -- did you
 4      think that was your job as manager to go to them
 5      and ask for things on behalf of your department
 6      like resources, extra money, extra equipment, more
 7      uniforms, things like that?
 8           A      Under normal circumstances in a
 9      normal job, I would think so.
10                    But not in this job.  I thought I
11      had no capacity whatsoever.
12           Q      Okay.  Did you complain to
13      Mr. Bland or Mr. Jenkins (sic) about your lack of
14      alleged authority to do any of these managerial
15      duties?
16           A      Mr. Bland would not entertain
17      conversation with me.
18           Q      Okay.  Did you ask anyone else?
19           A      Pardon me?
20           Q      Did you ask anyone else?  Because
21      you were supposed to go to Valerie Jenkins.  Did
22      you ask her?
23           A      No.
24           Q      Why not?
25           A      I guess maybe I was just defeated.
```



1        Q       Okay.

2        A       Maybe I'd been through enough and I

3    was just defeated.

4        Q       Here is the next exhibit.

5                (2/24/22 email from Carman to

6                Bland, one page marked as Carman

7                Exhibit Number 5)

8    BY MS. NORTH:

9        Q       What we've entered as Exhibit 5 is

10   an email from you to Mr. Bland; right?

11       A       Yes.

12       Q       And Edward Bland is the executive

13   director of the Authority; correct?

14       A       Yes.

15       Q       Okay.  And it says as of

16   February 24th 2022, you were confirming in an

17   email some of the directives he had given you

18   about the use of force and carrying weapons in

19   your department; right?

20       A       That's correct.

21       Q       Some things were changing; is that

22   right?

23       A       Yes.

24       Q       Okay.  And so was it up to you to

25   go back to your team members, Tenisha, Kevin, and



1    Nathan, and make sure they understood these

2    changes?

3          A      Yes.

4          Q      Okay.  And were you to serve as the

5    compliance officer overseeing the accurate

6    documentation regarding all training and licensing

7    for the department?

8          A      I've never been certified as a

9    compliance officer.

10         Q      I don't -- I'm not talking about

11   any kind of official certification.

12                Were you designated like you said

13   here to serve as the compliance officer for the

14   Authority about overseeing training and licensing?

15         A      That's what I had in mind at this

16   time.

17         Q      Okay.  Let me show you these last

18   documents.

19                There you go.

20                Mr. Carman, what we've entered as

21   Exhibit Number 6 is an email.  At the bottom you

22   will see it's from you to Edward Bland with some

23   other individuals copied who are at the Authority;

24   right?

25         A      Yes.



```
 1                    (2/24/22 emails re:  Reduction in

 2                    security availability and

 3                    capability, two pages marked as

 4                    Carman Exhibit Number 6)

 5  BY MS. NORTH:

 6          Q       And, again, it was to document and

 7  implement some directives about reducing security

 8  staff hours, not having weekend patrols, and that

 9  the -- the fact that some -- some folks would be

10  unarmed; is that right?

11          A       Whatever it says on the paper, yes.

12          Q       Okay.  And were you responsible for

13  making sure that the staff didn't work any more

14  hours than what was directed to you?

15          A       No.

16          Q       Who made sure that the hours

17  weren't exceeded?

18          A       Valerie Jenkins -- or Valencia

19  Jenkins.

20          Q       Okay.

21          A       I keep calling her Valerie Jenkins.

22  It's Valencia.

23          Q       Okay.

24          A       It's -- "Val" is what we always

25  called her.
```



```
 1            Q       Okay.

 2            A       Val Jenkins.

 3            Q       Okay.  So she worked individually

 4     directly with each one of you in the security

 5     department to make sure the hours weren't exceeded

 6     as outlined in this email; is that right?

 7            A       To be fair, we discussed it.  And

 8     this is only two days after signing this letter.

 9     I'm not sure at what point it was that I was told

10     to have no more communication with Bland, but it

11     was soon after this.

12            Q       Okay.  That's fine.  I just --

13            A       Well, let me -- let me get to it.

14                    I do recall in laying out the

15     schedule and doing this, there was discussion with

16     Miss Jenkins, because she and Alisa Winston had a

17     fit over the fact that we weren't going to have

18     weekend patrols, and they said, We can't do that.

19     That's what -- they said to me that.

20            Q       Okay.

21            A       So...

22            Q       Why are they talking to you instead

23     of each individual person on your team?

24            A       Because this was two days after the

25     letter, ma'am.
```



```
 1              Q       Okay.

 2              A       Let's be realistic.  It was two

 3      days after the letter was signed.

 4              Q       What does that mean?

 5              A       Well, it means that up until

 6      whenever it was that I was told to not have any --

 7      to not do anything, basically I was under the

 8      assumption this was my job (indicating).

 9              Q       Okay.  So you did that --

10              A       But I found out later that this

11      wasn't my job.

12              Q       Okay.

13              A       I found out later this was just not

14      my job (indicating).

15              Q       All right.  So was there a decision

16      to reinstate the weekend patrols?  If you

17      remember.

18              A       I know I did it.  I did the weekend

19      patrol.

20                      I truly don't remember.

21              Q       Okay.  That's fine.  I'm only

22      asking what you remember.

23              A       Right.  I truly don't remember.

24              Q       Right, okay.

25                      So there was a time after
```



1  February 22nd, 2022, when you believed you were

2  supposed to manage the department and carry out

3  normal managerial duties on behalf of the

4  department; right?

5          A       Yes.

6          Q       And how -- how long did you -- were

7  you under that belief until you say Mr. Bland told

8  you otherwise?

9          A       It wasn't very long.  I don't have

10  a specific day, but it just -- I felt like from

11  day one he was trying to get rid of me.  That's --

12  that's what I feel like.

13          Q       Okay.  Even though he hired you and

14  offered you a full-time position?

15          A       Yes, ma'am.

16          Q       Okay.

17          A       I felt like he hired me and offered

18  me a full-time position because he didn't want to

19  get sued.

20          Q       Well, you sued him anyway.  It

21  doesn't control whether someone sues you; right?

22          A       Correct, I did.

23          Q       Here you go.  That's the next

24  exhibit.

25



```
 1                        (2/24/22 email/attachment, ten

 2                        pages, re:  Misclassification of

 3                        worker status marked as Carman

 4                        Exhibit Number 7)

 5     BY MS. NORTH:

 6            Q       Take your time and take a look at

 7     that.

 8                        Do you recognize that, Mr. Carman?

 9            A       I do.

10            Q       Okay.  And so what we've entered as

11     Exhibit Number 7, again, is an email from you to

12     various folks at the -- first to Bruce Lalonde.

13                        Who is Bruce Lalonde.

14            A       He was the chairman of the board of

15     directors here.

16            Q       Okay.

17                        All right.  And so if you turn the

18     page, what you did is send him a copy of a concern

19     that you had forwarded to Alisa -- Alisa Winston;

20     right?

21            A       Yes.

22            Q       And it outlined that you were

23     dissatisfied with how you came on board full time

24     with the Authority; is that right?

25            A       Yes.
```



```
 1            Q       Okay.  And after -- after the --
 2    let me see here.
 3                    After you sent this to Alisa on
 4    February 11, you were offered the full-time
 5    position with the Authority on February 22, 2022;
 6    right?
 7            A       Yes.
 8            Q       Okay.  Did you ever get a response
 9    from someone from the Authority on your
10    February 11, 2022, email to Alisa?
11            A       I don't remember.
12            Q       So you don't remember whether the
13    Authority ever responded to your complaint?
14            A       They responded to me, not in
15    writing, I don't remember if they did, but they
16    responded to me by me having a meeting with
17    Mr. Bland.
18            Q       Okay.  Tell me what happened.
19            A       That's when we had the meeting and
20    this transpired, this February 22nd document.
21            Q       Okay.  I will give this to you.
22                    Do you recognize that, Mr. Carman?
23            A       Um-hum.
24            Q       And what we've entered as
25    Exhibit Number 8 is a copy of an email you sent to
```



```
 1   some Portsmouth Authority folks talking about how
 2   you felt you were misclassified as a worker;
 3   right?
 4           A       Yes.
 5           Q       Okay.
 6                   (2/22/22 email/attachment
 7                   Carman000001-10 marked as Carman
 8                   Exhibit Number 8)
 9   BY MS. NORTH:
10           Q       Was this -- I see it was 10:28 a.m.
11                   Is this before or after you signed
12   the offer letter for full-time employment?
13           A       It was before.
14           Q       Did you know this offer letter was
15   coming on February 22nd, 2022?
16           A       To my knowledge, it wasn't, so, no,
17   I did not know.
18           Q       So when you left -- you said you
19   met with Mr. Bland before the February 22nd, 2022,
20   offer letter.
21                   How did you leave that meeting as
22   far as -- did you agree upon anything?
23           A       Not that I recall, no.
24           Q       Okay.  And so you had no idea that
25   he was going to make you a full-time job offer?
```



```
 1          A       Absolutely none.

 2          Q       Okay.  And let me see here.

 3                  This is what I need next.  This is

 4   your resignation.  I forgot to put a sticker on

 5   it.  Forgive me.

 6                  Do you recognize that, Mr. Carman?

 7          A       I do.

 8          Q       Okay.  What we've entered as

 9   Exhibit Number 9 is your resignation; is that

10   right?

11          A       Yes.

12          Q       And it's dated May 3rd, 2022?

13          A       Yes.

14                  (5/3/22 email re:  My resignation,

15                  two pages marked as Carman Exhibit

16                  Number 9)

17   BY MS. NORTH:

18          Q       Did you depart on May 3rd, 2022,

19   that same day?

20          A       I'm pretty sure I did.

21          Q       I just didn't know if you recalled

22   giving any kind of notice.

23          A       No.

24          Q       All right.  And so you told the

25   Authority that you were resigning and that you
```



```
1    were reporting a violation to the Department of
2    Labor and that you were going to file complaints
3    with the EEOC.
4                    And you request some damages at the
5    bottom.  It says that you felt like you were owed
6    overtime wages.
7         A      Yes.
8         Q      30- -- excuse me $32,947.50; is
9    that right?
10        A      No, no, I don't think -- wait a
11   minute.
12        Q      Let's see.
13        A      Based upon the total amount I was
14   paid, which is 32,947.50, I'm entitled to
15   compensation for.
16        Q      Okay, I gotcha.  Thank you for that
17   clarification.
18                    So how did you calculate the one,
19   two, three, four -- five separate itemizations
20   below that 32,974.50 number?
21        A      Based on the total hours that I
22   worked and the rate that I would have been
23   compensated for my Social Security tax off of
24   32,974.50; also, the same for Medicare; my VRS
25   contributions, 8 percent of total pay, which is
```



1   what I should have been paid if I was working as

2   an employee here as I should have been.

3           Q       Should have been contributed you

4   mean to your plan?

5           A       That they would have contributed on

6   my -- yeah.

7           Q       Okay.

8           A       Yes.  And Workers' Comp insurance

9   that I had self-paid.  I have receipts for that,

10  for that $514.38.

11          Q       Okay.  That was before you were

12  employed full time; correct?

13          A       Right.  It ran through 2/22.  10/22

14  to 2/22.

15          Q       Should that be 10/21 to 2/22?

16          A       Yes.

17          Q       Okay.

18          A       But it was already 2/22, and I was

19  confused.

20          Q       I gotcha.

21          A       Unpaid vacation 6 days at 8 hours,

22  and I used the employee handbook for the number of

23  days that that would have amounted to.

24          Q       So did anyone help you do these

25  calculations or you just did them yourself?



```
 1          A       I just did them myself --
 2          Q       Okay.
 3          A       -- using the formulas that I got
 4  off the internet as if I were doing payroll.
 5          Q       Right.
 6                  So did you get any response to this
 7  demand, basically?
 8          A       No.
 9          Q       Okay.  Did you have a lawyer at the
10  time you wrote this?
11          A       No.
12          Q       How far did you find your lawyer?
13          A       I went on the internet searching
14  for an attorney that handled -- that specialized
15  in this sort of thing.
16          Q       And what's your arrangement with
17  the attorney?
18          A       They are my attorney.
19          Q       I know.  But how are you paying
20  them?
21          A       They will get paid if we win the
22  case.
23          Q       Okay.  So they are on a contingency
24  fee?
25          A       Yes.
```



1        Q      What's the percentage?

2        A      It could be up to 40 percent.

3        Q      Okay.  Do you know how much in

4    attorneys' fees that they have spent already?

5    Have they sent you any kind of statement or

6    anything?

7        A      No idea.

8        Q      Did you pay any kind of retainer or

9    anything?

10       A      I did not.

11       Q      Okay.  Can you list for me the --

12   all the damages that you're claiming in this case,

13   like what monies you think you were owed and for

14   what time period.

15       A      Now that I have an attorney, I

16   would rather not do that until I have spoken with

17   my counsel to see exactly what I'm entitled to.

18       Q      Well, the time is now to do that

19   when your deposition is taken.  I hope that you've

20   been working with your attorney to give that

21   information.  We requested it in writing in

22   discovery, so hopefully you've given that to him.

23              So any information you have on

24   that, if you know it, you have to -- you have to

25   disclose it at this time.



1          A       Well, this is what I've articulated
2     right here to the best of my knowledge
3     (indicating).
4          Q       Okay.
5          A       But I don't know what else I would
6     be entitled to.  I don't know what the limits are,
7     what the -- you know, I don't know.
8          Q       Okay.
9          A       I really don't know.
10         Q       Okay.
11         A       All I know is I want what's fair
12    and reasonable.  I don't want anything that's
13    unfair and unreasonable.  I'm not trying to get a
14    hundred thousand dollars.
15         Q       Okay.  Do you mean you want -- you
16    want what's legally -- that you feel if you should
17    win what you're legally entitled to?  Because
18    that's different than fair and reasonable.
19                 Is that fair to say?  You want what
20    the law says --
21         A       Yes.
22         Q       -- you get if you get anything?
23         A       Yes.
24         Q       So have you discussed with your
25    attorney what hours you worked and what overtime



```
1    you think you've worked and how much that equates
2    to?  Have you done any of that?
3         A      I have not.
4         Q      Okay.  Have you been asked by your
5    attorney to do that at all?
6                MR. SHORT:  I'm going to object to
7    attorney/client privilege.
8                MS. NORTH:  I didn't ask him what.
9    I just said, Have been asked to answer discovery.
10   BY MS. NORTH:
11        Q      I don't want to know what you
12   talked about with your lawyer.  I just want to
13   know did he ask you to look at some things that we
14   sent you and asked for documentwise and
15   questionwise?
16        A      Not that I recall.
17        Q      Okay.  Did you review and approve
18   the lawsuit that was filed in this case?
19        A      Yes.
20        Q      Okay.  Do you understand what your
21   claims are in this case?
22        A      Yes.
23        Q      Okay.  Can you outline them for me
24   briefly what you understand?
25        A      Not without a document in front of
```



1   me to refresh my memory in case I miss something.

2          Q        I don't expect you to remember

3   everything.

4          A        Basically, the way I understand

5   it --

6          Q        Yes, sir.

7          A        -- is if we prevail on this, I

8   would be entitled to be compensated for my

9   overtime hours --

10         Q        Okay.

11         A        -- that I did not get paid.

12                  Beyond that, depending upon the

13  egregiousness as may be seen by a court of

14  competent jurisdiction, there may be double

15  damages.  I don't know.

16         Q        Okay.

17         A        I don't know enough about this type

18  of law to address anything beyond that.

19                  I would presume that one would be

20  entitled to be reimbursed for where I've had to

21  pay my own Social Security for the time that I was

22  not being properly paid and I had to pay into my

23  own Medicare, because I did have to pay into those

24  through the IRS.

25                  So I really don't -- I really don't



```
 1   know other than -- what I understand is that this

 2   action is exclusive for unpaid overtime wages.

 3          Q       Okay.  I appreciate that.

 4                  Let me hand you the last exhibit.

 5          A       Okay.

 6          Q       It's your pay.

 7                  And do I have that right?  Is that

 8   10?

 9          A       Yeah, this is 10.

10                  (Pay Detail, 45 pages marked as

11                  Carman Exhibit Number 10)

12   BY MS. NORTH:

13          Q       Take a look at that packet,

14   Mr. Carman, and I need you to clarify whether

15   that's all the hours you submitted and this is all

16   the pay that you received from the Authority.

17          A       Do you want me to go through every

18   single one of these?

19          Q       Yes, sir.  Hopefully it's the not

20   the first time you've been seeing some of this

21   stuff, so...

22          A       Well, it is.  It will take awhile.

23          Q       Take your time.

24          A       May I ask a couple qualifying

25   questions to kind of short-shoot through this?
```



```
1          Q       Sure.

2                  And let me direct your attention to

3     the first thing right here.

4                  If you look on the second page,

5     Number 2, is that something you all would submit,

6     your team, to the Portsmouth Authority?

7          A       Yes.

8          Q       It has hours.

9                  So if you look -- that's why I was

10    hoping you can see your name and you can see the

11    dates you worked and the hours you worked and the

12    rate.

13         A       Um-hum.

14         Q       So can you verify that?

15         A       This appears to be correct.

16         Q       Okay.

17         A       As far as the total and all that, I

18    would have to go here line by line and go based

19    off the emails and stuff where I emailed these in

20    and kept my own records, but I'm pretty sure,

21    because some of these documents -- this one here,

22    this is signed by Marc Gonzalez.

23         Q       Sometimes they have both your names

24    on it --

25         A       Yeah.
```



1        Q        -- because it's both of you.

2                 So it's just for you to verify on

3    behalf of yourself, not on behalf of anybody else.

4        A        I'm going to do this.  I'm going to

5    say it this way.  Based upon my experience in

6    accounting with the PRHA, I'm going to assume this

7    is a thorough document and I'm going -- my

8    testimony -- my answer will be that, qualified

9    with this.  If all of the pay sheets are here,

10   this would be an accurate assessment --

11       Q        Correct.  Okay, I appreciate that.

12       A        -- instead of going through line by

13   line.

14       Q        I understand that.

15                All right.  And if you could look

16   at that, this is for the time that you worked

17   before you became an employee in February of 2022.

18                If you look at this, it takes you

19   through the end of 2021.

20       A        Yes.

21       Q        Okay.  And so, again, if you turn

22   to the second page of Exhibit 10 and you see your

23   name and the date worked and the hours worked and

24   the hours and the rate, of course you submitted

25   those hours; right?  On behalf of yourself.



```
 1                    Do you see where it says Mark
 2   Carman?
 3            A       Yes, I submitted those to the
 4   supervisor.
 5            Q       Okay.  So whenever we see this type
 6   of document in your packet related to you and your
 7   hours, you are testifying that those are accurate
 8   hours that you worked during that time?
 9            A       Not being able to dispute it and
10   knowing the accounting of my previous
11   experience --
12            Q       Yes, sir.
13            A       -- I'm going to stipulate that is
14   accurate.
15            Q       Okay.  Thank you.
16            A       I believe that to be accurate.
17            Q       Okay.  So I lied a little bit.  I
18   thought that was the last exhibit, but this is
19   actually the last exhibit.
20            A       I don't want to have to say in
21   front of this court reporter that I need to use
22   the bathroom.
23            Q       Let's go ahead and take a break.
24            A       If you just got one more
25   document...
```



```
 1            Q       Let's -- it's certainly fine for
 2    you to take a break.
 3            A       I didn't want that in the record,
 4    but...
 5            Q       It's okay.
 6            A       I know.
 7            Q       Here you go.  Take a look at that
 8    for me, Mr. Carman.  I would submit that this is
 9    your pay for the time that you were an employee
10    and being paid a salary.
11            A       Okay.
12                    (Pay Summary, seven pages marked
13                    as Carman Exhibit Number 11)
14    BY MS. NORTH:
15            Q       So you just look at that and let me
16    know --
17            A       Yes, I'll stipulate this is
18    accurate because I never seen -- I have never seen
19    these type sheets.
20            Q       Okay.  But I just want you to look
21    at the information on it.
22                    Your salary, according to the
23    payroll, was 1870 biweekly based on the salary in
24    your employment letter; right?
25            A       I believe that would be accurate.
```



1       Q       Yes, sir.

2               And if you look -- let me see what

3    page it is -- it's a payment for your vacation

4    when you departed.  I'm looking for that.

5               Do you recall getting a check for

6    that as well?

7       A       Not --

8       Q       Here it is, the second page.  It's

9    for 389.19 for 16.65 hours of vacation.

10      A       I recall that.

11      Q       Okay.  And so you were paid that

12   out; correct?

13      A       Yes.

14      Q       All right.

15              MS. NORTH:  All right.  Let's go

16   off the record and take a break.

17              THE WITNESS:  Yes.

18              (Recess)

19              MS. NORTH:  Back on the record.

20   BY MS. NORTH:

21      Q       So, Mr. Carman, just to make sure I

22   understand your claims, for the time that you were

23   a full-time employee, are you saying that you were

24   not paid for some overtime you worked?  Are you

25   asserting that you didn't record hours that you



1    worked?

2          A       I am asserting that, yes.

3          Q       Okay.  So we need to go through and

4    from February 22nd of 2022 through May 3rd, I need

5    to know how many hours per week you're saying you

6    worked.

7          A       I -- it would be mere speculation

8    because it really was around-the-clock.  It would

9    be work a normal 40-hour week; okay?  That normal

10   40-hour week would be arrive at about 8:30 --

11         Q       Okay.

12         A       -- and then I would work about four

13   to six hours, then come back because most of our

14   work would be in the evening hours.

15         Q       Okay.

16         A       Now, there were times when I would

17   get called out first thing in the morning because

18   there's somebody sleeping in one of the foyers in

19   one of the apartment-type houses.

20         Q       Okay.

21         A       So I would respond to that.

22                 If there's a shooting.  If there's

23   a fire.  If there is some sort of a serious-nature

24   thing, the police were told to notify me.  So I

25   would get a call from 911 dispatch to respond.



1           So I don't have any way of

2   calculating it.

3           I can say that a typical week would

4   be -- it seemed like I worked all the time,

5   because sometimes I did.

6           But a typical week would -- after

7   they cut it back to the 33 hours piece for those

8   guys, I was probably working 60 hours a week,

9   roughly.

10      Q    Okay.  I need you to try to do your

11  best to be as specific as possible because you're

12  claiming unpaid money for it.

13      A    Yeah.  And I don't have any way to

14  back it up because I didn't keep those records.  I

15  was told to turn it in.  So it's mere speculation

16  on my part.  So if I can't prove that, I can't

17  prove it, but I'm just going based on what I can

18  recall.

19      Q    Okay.  And you think you were --

20  you think you worked 60 hours per week?

21      A    And I'm -- I'm going to say that

22  that was -- that that's probably conservative.

23          Let me do it this way.  I would

24  work a shift with them almost every day.  Then I

25  would work four, maybe six, seven hours before



1   that, then go home for a while, and then come

2   back.

3                    So like if I had things to do

4   during the day.  I've gone to court a couple of

5   times, you know, with house counsel.

6          Q       Sure.

7          A       And I've had things, you know, that

8   had to be done during the day, insurance

9   investigations, something like that.  But then I

10  would be back out at night because I didn't want

11  one person out there.  It's unsafe for one person

12  to be back there by themselves in this

13  environment.  So I would be out.

14                   And then if I got called out for,

15  like I said, for emergency things, I didn't

16  calculate that because at that point I felt like

17  it was just in a situation where I was just going

18  to get paid salary and that was it.

19         Q       Okay.  So 911, the officers would

20  call you because you were supposed to be manager

21  of the department; right?

22         A       Well, sometimes officers would call

23  me.

24         Q       Okay.

25         A       Normally --



```
 1          Q       You said they were directed to call

 2   you, so...

 3          A       No, no, no.  I think we're talking

 4   about two different things.

 5          Q       Okay.

 6          A       The 911 dispatch, the police

 7   dispatch or fire dispatch would call my house.

 8          Q       Yeah.

 9          A       I also had a radio that

10   communicated with the police --

11          Q       Okay.

12          A       -- and the fire.  So I had police

13   and fire channels.

14          Q       All right.

15          A       So I would get calls to respond.

16          Q       Okay.

17          A       Now, as far as the employees, yes,

18   we'll go back to our previous conversation -- the

19   previous question -- where if they got in a

20   situation where they ran up on something, hadn't

21   been reported to 911 -- I seem to recall that they

22   rolled up on a stabbing where a woman was

23   murdered, and they got there before 911 got it,

24   I'm pretty sure, because they saw it on normal

25   patrol and I was heading that way when I got the
```



```
1    call.

2          Q       When you got the call.

3          A       So, yes, they would let me know --

4          Q       Okay.

5          A       -- as I would have let them know,

6    and I always did let them know when 911 called me,

7    Hey, you need to roll this direction.

8          Q       Okay.  I'm trying to clarify,

9    though.

10                 But 911, when the police or

11   firehouse called you, it was because --

12         A       I was the manager.

13         Q       Right, okay.

14         A       That is correct.

15         Q       Okay.

16                 Okay.  And the -- to the best of

17   your recollection, you're going to say you worked

18   60 hours per week, because you're going to have to

19   answer this.

20         A       Yes.

21         Q       It was due today.  And so that's

22   why I'm trying to press you on --

23         A       I understand.

24         Q       -- now is the time to do to the

25   best of your recollection how many hours a week
```



1    are you going to submit in this case.

2           A       To the best of my knowledge and

3    belief, a typical week would be 60.

4           Q       Okay.

5           A       And I'm sure it was more, but I

6    don't want to overstate and I don't want to

7    understate.  But a typical week -- I don't have a

8    pen.  So if I worked -- if I came in at eight and

9    worked until one, about 8:30, 9:00, worked until

10   12:30, 1:00, that's four hours.

11          Q       Okay.

12          A       So if I go and I add those four

13   hours, that's going to turn a 40-hour week into a

14   68-hour week because that's -- 7 times 4 is 28 on

15   top of 8 hours at night, so I'm going to say 60

16   hours --

17          Q       Okay.

18          A       -- because it wouldn't be every

19   single day.

20          Q       Right.

21          A       But then it would also be weekends,

22   Saturdays, Sundays.  A lot of times we had no

23   coverage on Saturdays and Sundays after that

24   was -- so I would work both days.

25          Q       Okay.



1          A       I would go to church, leave church,

2    come to work.

3          Q       So I thought at the beginning of

4    your testimony you said you would keep track of

5    your hours worked.

6          A       I did until I went on salary.

7          Q       Okay.  And then you stopped?

8          A       Yes.

9          Q       Okay.  But didn't you stop because

10   when you first took the job you thought you were

11   salaried and not entitled to overtime because you

12   were a manager?

13         A       No.  I stopped because I was told

14   to turn in 40 hours.

15         Q       Okay.  And did they tell you to

16   turn in 40 hours because you don't get paid

17   overtime --

18         A       Yes.

19         Q       -- as a manager?

20         A       Yes.

21         Q       That's why?

22         A       Yes.

23         Q       Okay.  Mr. Carman, have you

24   understood all the questions I've asked you today?

25         A       I have.



1        Q        Okay.  And is there anything you
2    want to add?  Do you want to add to your testimony
3    at all?
4        A        There was something came up awhile
5    ago, and I don't think it's even worth bringing
6    up.
7                    MR. SHORT:  I'm not sure...
8                    THE WITNESS:  You don't have
9    anything?
10                   MR. SHORT:  We'll reserve our
11   questions for trial.
12                   THE WITNESS:  Okay.  Understood.
13                   Nothing that comes to mind.
14                   MS. NORTH:  Okay.  I understand.
15                   All right.  I thank you for your
16   time today, Mr. Carman.
17                   And I would just say to you that
18   your attorney is working on answering discovery
19   that we sent you.  It's a request for documents
20   and answering some questions that we sent you, and
21   I just hope you receive those and review those
22   with your counsel.
23                   THE WITNESS:  Thank you.
24                   MS. NORTH:  Thank you for coming in
25   today.



1    (Whereupon, the deposition was

2    concluded at 3:44 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


ZAHN
COURT REPORTING
www.zahncourtreporting.com

1           I, MARK CARMAN, do hereby certify that I

2     have read the foregoing transcript of my testimony

3     and further certify that said transcript, with the

4     corrections noted below, is a true and accurate

5     transcript of said testimony.

6           Dated at _____ this _____ day of

7     _____, 2023.

8

9

10                        ERRATA SHEET

11    PAGE      LINE       CORRECTION              REASON FOR CHANGE

12    _____     _____     _____   _____

13    _____     _____     _____   _____

14    _____     _____     _____   _____

15    _____     _____     _____   _____

16    _____     _____     _____   _____

17    _____     _____     _____   _____

18    _____     _____     _____   _____

19    _____     _____     _____   _____

20    _____     _____     _____   _____

21    _____     _____     _____   _____

22    _____     _____     _____   _____

23    _____     _____     _____   _____

24    _____     _____     _____   _____

25



1

2

3       _____

4                    MARK L. CARMAN

5

6

7

8

9  COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

10

11

12            Subscribed and sworn to before me this

13    _____ day of _____, 202_____.

14

15

16

17

18

19                _____

20

21  MY COMMISSION EXPIRES:                    Notary Public

22  _____

23

24

25



1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2         I, Kerry E. Zahn, RMR-CRR, eNotary and

3    Notary Public for the Commonwealth of Virginia at

4    Large, of qualification in the Circuit Court of

5    the City of Norfolk, Virginia, and whose

6    commission expires    March 31, 2025, do hereby

7    certify that the within named deponent, MARK L.

8    CARMAN, appeared before me at Portsmouth,

9    Virginia, as hereinbefore set forth, and after

10   being first duly sworn by me, was thereupon

11   examined upon his oath by counsel for the parties;

12   that his examination was recorded in Stenotype by

13   me and reduced to computer printout under my

14   direction; and that the foregoing constitutes a

15   true, accurate and complete transcript of such

16   proceeding.

17        I further certify that I am not related to

18   nor otherwise associated with any counsel or party

19   to this proceeding, nor otherwise interested in

20   the event thereof.

21        Given under my hand and notarial seal this

22   18th day of May, 2023, at Norfolk, Virginia.

23

24   Kerry E. Zahn, RMR-CRR

25


ZAHN
COURT REPORTING
www.zahncourtreporting.com

## $

**$19** 12:12

**$20** 12:15

**$22** 12:16,25 27:7

**$32,947.50** 86:8

**$48,620** 45:12

**$514.38** 87:10

## 1

**1** 22:7,23

**10** 63:11 93:8,9,11 95:22

**10/21** 87:15

**10/22** 87:13

**10:28** 84:10

**11** 83:4,10 97:13

**12:30** 104:10

**15** 5:6 63:11

**16.65** 98:9

**17** 23:1

**18** 21:19

**1870** 97:23

**18th** 21:17,20

**19** 12:18,22 27:6

**1950** 5:9

**1989** 14:20

**1:00** 104:10

## 2

**2** 24:5,9 59:13 94:5

**2/22** 87:13,14,15,18

**2/22/22** 84:6

**2/24/22** 76:5 78:1 82:1

**20** 19:13 27:6

**2014** 14:23

**2014/2015** 15:10

**2016** 15:12

**2020** 44:12

**2021** 11:12 15:22 17:18 18:16 20:18 21:4,5 23:1 95:19

**2022** 20:17 44:25 46:14 47:7,17 49:20 50:8 52:22 54:25 56:3 57:9 60:11 69:20 76:16 81:1 83:5,10 84:15,19 85:12,18 95:17 99:4

**2023** 5:6

**21st** 21:18

**22** 57:9 69:21 83:5

**22nd** 44:25 47:7 52:22 54:25 56:3 59:17 69:20 81:1 83:20 84:15,19 99:4

**24th** 76:16

**28** 104:14

**2:00** 5:6

## 3

**3** 44:24 45:3 50:13,15 57:5 60:22

**30** 19:13

**30-** 86:8

**30th** 21:3

**3116** 5:7

**31st** 21:3

**32,947.50** 86:14

**32,974.50** 86:20,24

**33** 60:9,12 100:7

**389.19** 98:9

**3:44** 107:2

**3rd** 85:12,18 99:4

## 4

**4** 49:16,24 104:14

**40** 28:20,23 51:16 59:12,15 89:2 105:14,16

**40-hour** 99:9,10 104:13

**45** 93:10

## 5

**5** 48:16 76:7,9

**5/3/22** 85:14

**50** 19:12 28:25

## 6

**6** 77:21 78:4 87:21

**6/17/21** 24:12

**60** 28:25 29:23 100:8, 20 103:18 104:3,15

**65** 21:9

**68-hour** 104:14

## 7

**7** 82:4,11 104:14

**70** 52:8

## 8

**8** 83:25 84:8 86:25 87:21 104:15

**80** 52:8

**80s** 14:10

**8400** 7:20

**8:30** 99:10 104:9

## 9

**9** 85:9,16

**90** 52:8

**911** 99:25 101:19 102:6,21,23 103:6,10

**9:00** 104:9

## A

**a.m.** 84:10

**abbreviation** 7:17

**ability** 30:21 73:17, 24 74:4,11

**Absolutely** 52:25 85:1

**accept** 48:19

**accepted** 18:20

**access** 43:23

**accordance** 5:8

**accounting** 95:6 96:10

**accurate** 77:5 95:10 96:7,14,16 97:18,25

**act** 72:16

**acting** 42:13

**action** 93:2

**actual** 9:19 21:1,2

**ad** 35:21

**add** 104:12 106:2

**additional** 74:14

**address** 7:14,21,24 8:2,5 92:18

**addressing** 27:18

**adopted** 33:14

**advertisement** 11:19

**affect** 7:7

**afternoon** 5:17,18

**agree** 73:20 84:22

**agreed** 13:3

**ahead** 11:13 25:18 30:14 38:8 74:10


ZAHN
COURT REPORTING
www.zahncourtreporting.com

96:23

**Alisa** 32:9 43:15
79:16 82:19 83:3,10

**allegations** 9:19

**alleged** 75:14

**alleging** 28:17

**allowed** 60:13,16
70:6,13

**amazing** 8:10

**amended** 5:10

**amount** 13:2 49:3
51:12 86:13

**amounted** 87:23

**annual** 45:12 51:21

**answering** 106:18,
20

**anymore** 7:23 61:21
71:17

**apartment-type**
99:19

**apologize** 66:18

**appears** 94:15

**applicant** 38:11
39:14

**application** 38:9,17
69:1

**applied** 35:25 38:15

**applies** 62:20

**apply** 38:10

**applying** 39:9

**appointment** 36:7,
10

**approvals** 39:10

**approve** 26:13 53:7,
12 91:17

**approved** 57:13
61:20,23

**approves** 53:16

**area** 31:11

**argued** 48:20 52:5,6

**armed** 36:16,17
37:20

**around-the-clock**
99:8

**arrangement** 88:16

**arrest** 36:17 37:8,16,
20,21

**arrive** 99:10

**articulated** 90:1

**asserting** 98:25
99:2

**assessment** 95:10

**assigned** 62:5,7,9

**assume** 95:6

**assumed** 73:2

**assumption** 80:8

**attention** 94:2

**attorney** 88:14,17,
18 89:15,20 90:25
91:5 106:18

**attorney/client** 91:7

**attorneys'** 89:4

**August** 8:14 21:17,
20 45:22 46:14

**authority** 5:21,22
9:9 10:20 11:10,17
12:6 14:3 15:21 16:6,
22 17:1,18 18:14
19:1,12,22 23:1
24:19,25 25:3,9
26:25 27:22 28:10
30:19 33:14 34:2,8
35:9 36:17,23 37:8,
17,20,21,24 38:12
39:11,15 40:16 41:25
44:3,10,15 45:9,16
46:1 52:11,23 56:9,
12,17,18 58:13 67:20
69:1,3,7,11,14,16
70:15 71:16,22,23
72:21 73:1,2 75:14
76:13 77:14,23 82:24
83:5,9,13 84:1 85:25
93:16 94:6

**Authority's** 28:2
58:23

**authorization** 16:3

**automobiles** 40:24,
25

**availability** 19:21
78:2

**awhile** 93:22 106:4

**B**

**back** 9:23 10:2 14:9
15:4 17:5 44:11
48:15 50:7,18 60:9
68:18 76:25 98:19
99:13 100:7,14
101:2,10,12 102:18

**background** 35:8

**ball** 17:7

**ban** 34:15

**bank** 8:4

**banking** 24:21

**banned** 34:16

**Barangays** 7:18

**based** 20:20 33:10
51:9 53:23 69:15
86:13,21 94:18 95:5
97:23 100:17

**basic** 46:4 52:1

**basically** 10:15
34:20 65:10,11 80:7
88:7 92:4

**basis** 65:4

**bathroom** 96:22

**bear** 21:25

**beginning** 29:17
105:3

**behalf** 5:2,13 36:7
75:5 81:3 95:3,25

**belief** 81:7 104:3

**believed** 81:1

**belt** 15:1

**benefits** 20:21 47:9,
19 50:24 60:8

**billy** 41:7 55:16

**bit** 96:17

**biweekly** 97:23

**blame** 15:2

**Bland** 12:4 31:1 32:6
43:14 47:12 48:25
50:2,18 53:4,7 56:12,
23 70:23 71:22
75:13,16 76:6,10,12
77:22 79:10 81:7
83:17 84:19

**blank** 33:23

**blanked** 7:2

**blurred** 23:23

**board** 18:2,5 82:14,
23

**body** 40:22

**Bonifacio** 7:19

**booklet** 59:3

**boss** 30:15,25 68:23

**bottom** 77:21 86:5

**bouncer** 35:17

**break** 96:23 97:2
98:16

**Brides** 16:18

**briefly** 91:24

**bringing** 106:5

**brings** 13:25

**BRNG** 7:18

**broken** 46:10

**brought** 33:15

**Bruce** 82:12,13

**bugged** 48:24

**bulletproof** 41:2

**business** 14:20
67:19

**C**

**C-A-R-M-A-N** 7:13



calculate 86:18 101:16

calculating 29:3 100:2

calculations 87:25

call 40:8 99:25 101:20,22 102:1,7 103:1,2

called 59:13 78:25 99:17 101:14 103:6, 11

calling 78:21

calls 102:15

camera 34:21,23 68:12,13

cameras 40:22 68:18

candidates 53:20, 23

capability 78:3

capacity 14:8,18 17:10 37:4 39:12 42:1 43:10 45:19 46:15,24 55:13 75:11

captain 13:17 18:1,6

car 69:23,24 70:10 71:17

cards 44:9

career 14:19

Carman 5:2,12,17 7:6,12 8:24 21:24 22:6,23 24:5,8 25:2 29:5 44:23 45:3 49:23 54:13 63:25 76:5,6 77:20 78:4 82:3,8 83:22 84:7 85:6,15 93:11,14 96:2 97:8,13 98:21 105:23 106:16

Carman000001-10 84:7

carry 81:2

carrying 76:18

case 10:10,16 88:22 89:12 91:18,21 92:1

104:1

categories 36:15

category 65:16

certification 37:16 44:19 77:11

certified 39:2,3 77:8

cetera 43:21,22 57:17 60:8

chairman 82:14

change 62:1 71:23

changed 9:24 62:18

changing 76:21

channels 102:13

check 98:5

Chesapeake 16:19

Chevy 69:22

church 105:1

circumstances 75:8

City 7:19

claiming 28:8 89:12 100:12

claims 91:21 98:22

clarification 86:17

clarify 93:14 103:8

classes 38:21,23

classification 49:22

clear 56:11 61:16 72:10

cleared 37:9

closely 68:14

club 41:7

co-litigant 9:7

co-litigants 9:6

co-workers 10:14

code 7:20 23:13

commencing 5:6

Commonwealth 5:4

communicate 44:4, 6 57:14

communicated 102:10

communication 79:10

Comp 87:8

companies 54:18

company 10:21

compensated 28:12,14 86:23 92:8

compensation 86:15

competent 92:14

complain 75:12

complained 29:11, 16 48:20

complaining 48:2

complaint 43:21 83:13

complaints 86:2

complete 25:11 49:15

completed 22:25 33:24

completely 7:2

compliance 77:5,9, 13

comprehensive 37:24

concern 82:18

concluded 107:2

conditions 46:11

confirming 76:16

conflict 40:6

confused 87:19

conservative 100:22

conservator 36:8, 11 37:15

consist 31:20

consisted 59:2

contact 11:17 56:23

contingency 88:23

contractor 18:16 23:18 28:3 29:5 30:5, 6

contractors 10:10

contributed 87:3,5

contributions 86:25

control 64:13,16 81:21

controls 70:23

conversation 6:13 9:16 75:17 102:18

copied 32:9 77:23

copy 22:23 82:18 83:25

correct 10:7 12:8 16:7,23 22:23 23:10 24:15 27:22 36:20 39:13 50:6 56:7 76:13,20 81:22 87:12 94:15 95:11 98:12 103:14

corrected 73:10

Correction 20:6

corrections 14:5 15:8,10,23 16:9 19:8, 16 20:20,25 21:22 29:8,22 33:12 40:11

correctly 29:3 66:4

counsel 9:5 22:9 89:17 101:5 106:22

country 8:10 9:14

couple 9:6 53:22 55:4,16 60:20 68:15, 17 93:24 101:4

court 5:9 6:7,17,23 38:18 39:10 66:12, 16,19 92:13 96:21 101:4

coverage 104:23

COVID 15:17


www.zahncourtreporting.com

**CPR** 44:19

**create** 67:17

**credentials** 14:8,17
44:15

**criminal** 46:9

**current** 8:21

**cut** 51:8 60:9 100:7

**cycle** 25:5

---

**D**

**daily** 31:17 32:13
57:20

**damage** 34:17

**damages** 86:4 89:12
92:15

**date** 21:23 45:22
56:21 73:3 95:23

**dated** 24:11 44:24
85:12

**dates** 94:11

**day** 17:24 48:5 57:1,
21,23 61:1 63:13
65:4 81:10,11 85:19
100:24 101:4,8
104:19

**day-to-day** 43:12
46:5 64:6 65:4 67:3

**days** 19:8,9,13 21:19
79:8,24 80:3 87:21,
23 104:24

**DC** 39:2

**DCJS** 35:22 36:24
37:9,13 39:3

**deal** 55:23

**decided** 26:7

**decision** 64:25
80:15

**decision-making**
52:10

**decisions** 30:20

**deducted** 27:24

**defeated** 75:25 76:3

**Defendant** 5:2,13

**degree** 71:14

**demand** 88:7

**denied** 65:7

**depart** 85:18

**departed** 98:4

**department** 13:18,
19 14:5 15:7,10,23
16:9 19:8,16 20:20,
24 21:21 29:8,22
33:12 40:10 47:18
48:9 50:5 54:22 56:4
61:11 64:3 67:18
68:23 69:9 70:16
71:21,24 74:13,17
75:5 76:19 77:7 79:5
81:2,4 86:1 101:21

**depended** 19:14
51:13

**depending** 19:19
92:12

**Depends** 51:23

**deposed** 5:13

**deposition** 5:1 6:2,
15 9:4,13 89:19
107:1

**deputy** 43:15

**describe** 14:2

**description** 49:9,14,
17,22

**designated** 77:12

**destruction** 31:16

**Detail** 93:10

**details** 31:21

**determine** 58:17
60:16

**determined** 43:4

**direct** 65:3 67:19
94:2

**directed** 30:15,16,25
32:8 78:14 102:1

**direction** 65:5 103:7

**directions** 31:2

**directives** 35:3
76:17 78:7

**directly** 25:3 53:11,
25 67:7,11 79:4

**director** 42:13 53:13
71:1 76:13

**directors** 82:15

**discipline** 41:19,23
64:15

**disciplined** 56:9
58:6

**disclose** 89:25

**discovery** 89:22
91:9 106:18

**discrepancy** 27:17

**discuss** 9:25 68:8,9,
10

**discussed** 79:7
90:24

**discussion** 68:20
79:15

**dismissed** 13:18

**dispatch** 99:25
102:6,7

**dispute** 26:11,17,22
29:2 96:9

**dissatisfied** 82:23

**doc-** 50:14

**document** 24:5
38:13 50:11,12,16
57:5 63:24 78:6
83:20 91:25 95:7
96:6,25

**documentation**
77:6

**documents** 21:25
34:6 39:14 44:22
77:18 94:21 106:19

**documentwise**
91:14

**dollar** 74:7

**dollars** 51:9 90:14

**double** 92:14

**downtown** 17:7

**drive** 20:14 21:9

**due** 27:19 103:21

**duress** 48:14 49:2

**duties** 50:3 67:3
75:15 81:3

**duty** 17:6

---

**E**

**earlier** 46:15

**early** 55:22 56:1
63:3,7

**easier** 25:19

**Ed** 53:4,7 56:12,23
70:23 71:22

**Edward** 31:1 76:12
77:22

**EEOC** 86:3

**Effective** 21:23

**egregiousness**
92:13

**element** 46:9

**email** 32:17 33:20
39:24 43:20,24 44:3,
4,5 56:22 76:5,10,17
77:21 79:6 82:11
83:10,25 85:14

**email/attachment**
82:1 84:6

**emailed** 94:19

**emails** 30:16 78:1
94:19

**emergency** 8:2 70:4
101:15

**employed** 15:22
28:10 29:21 30:1
36:9 45:15 87:12

**employee** 14:5
23:18 45:16 47:7,8
52:12,15 59:5 64:23



87:2,22 95:17 97:9
98:23

**employees** 30:13,
22,23 60:17,21 65:4
71:2 102:17

**employer** 8:22 9:1
60:16

**employment** 10:19
20:21 45:2,10 84:12
97:24

**encompassed** 46:8

**end** 13:5 33:21
57:20,21,22,23 95:19

**end-of-shift** 32:17
42:9

**ended** 14:13

**endorsements**
36:18

**enforcement** 15:5
35:8,14

**engaged** 11:17
13:11

**enotary** 5:4

**Enrollment** 24:7,15

**ensuring** 46:8

**entered** 24:5 44:24
49:16 76:9 77:20
82:10 83:24 85:8

**entertain** 75:16

**entire** 10:15 11:7

**entitled** 29:9 30:6
86:14 89:17 90:6,17
92:8,20 105:11

**entity** 16:25

**environment**
101:13

**equates** 91:1

**equipment** 40:17,
21,25 74:14 75:6

**essence** 10:15

**essentially** 37:25
68:25

**establish** 48:3

**evening** 99:14

**events** 31:25

**everyone's** 53:13

**evolved** 33:5

**examination** 5:1,15

**examples** 67:22
73:6

**exceeded** 78:17
79:5

**Excel** 25:16,24 26:15

**exclusive** 93:2

**excuse** 40:5 86:8

**executive** 53:13
76:12

**exempt** 38:24 51:20,
22 52:14,15

**exhibit** 22:6,23 24:5,
8 44:24 45:3 49:16,
23 50:13,15 57:5
60:22 76:4,7,9 77:21
78:4 81:24 82:4,11
83:25 84:8 85:9,15
93:4,11 95:22 96:18,
19 97:13

**existed** 71:15

**expect** 92:2

**expectation** 74:23

**expected** 52:3
74:12,16

**experience** 14:1,3,7
33:11 35:14 38:25
95:5 96:11

**extend** 45:10

**extended** 38:1,5

**extra** 75:6

**F**

**fact** 9:7,12 78:9
79:17

**fair** 24:19,20 25:2
29:13 79:7 90:11,18,

19

**familiar** 23:12

**family** 9:8

**February** 20:17,19
44:25 46:14,21 47:7,
17 49:20 50:8 52:22
54:25 56:3 57:9
59:17 60:11 69:20,21
76:16 81:1 83:4,5,10,
20 84:15,19 95:17
99:4

**fee** 38:17 88:24

**feel** 56:18 81:12
90:16

**fees** 89:4

**felt** 74:2 81:10,17
84:2 86:5 101:16

**fewer** 54:18

**file** 10:20 47:15 86:2

**filed** 8:25 91:18

**fill** 16:2 38:20

**filled** 66:2

**Finally** 51:6

**find** 23:15 39:22
88:12

**fine** 5:23 22:19 73:14
79:12 80:21 97:1

**finish** 6:10,11 74:9

**fire** 30:21 99:23
102:7,12,13

**firearms** 39:3

**firehouse** 103:11

**firing** 52:11 64:15

**firm** 11:4

**fit** 79:17

**Flashlights** 41:7

**folks** 78:9 82:12 84:1

**force** 35:2,4,5 76:18

**foremost** 19:15

**forget** 43:9

**Forgive** 85:5

**forgot** 85:4

**form** 22:23 23:7,16,
19 24:7,15 26:15
32:19

**forms** 32:13 33:17
34:15,16

**formulas** 88:3

**forwarded** 82:19

**found** 11:3 80:10,13

**foyers** 99:18

**friends** 10:13

**front** 91:25 96:21

**fuel** 40:24 70:14

**fulfill** 50:3

**full** 7:10 15:18,22
17:14 20:15 21:11
45:15,20,24 47:8,12
60:3 82:23 87:12

**full-time** 14:5,9
15:14 17:5 18:7
20:21 37:10 49:19
81:14,18 83:4 84:12,
25 98:23

**functions** 46:5

**G**

**games** 17:7

**gave** 25:16 26:12
35:3 37:25 48:25
56:13 71:7

**general** 6:4

**give** 6:5 22:10 25:22
31:3 32:12,18 33:17
34:6 42:8 64:19,21
65:5 67:22 73:5
74:18 83:21 89:20

**giving** 60:8 85:22

**glass** 46:11

**golf** 41:14

**Gonzalez** 9:11 17:23
35:12 36:3 39:21
40:9,11,14 42:3,11,



19 43:2 46:13 53:24
54:9,12 55:9 94:22

**Gonzalez's** 22:13
38:4,24

**good** 5:17,18 68:13

**Gordon** 16:16

**Gorley** 12:1 18:4
25:16,23 31:1,10
32:3 34:13 35:18
39:19 40:8 42:3,17,
24 47:4 53:4,24 55:9

**gotcha** 86:16 87:20

**Grammy** 14:23

**grids** 26:3

**grocery** 17:7 29:24
30:2

**guaranteed** 47:9,18
50:10 51:12 52:2

**guard** 13:10,14 17:8
31:3 34:4,7,10 35:1,
7,23 36:25 40:19
50:5 53:20 55:1
72:16

**guards** 35:15 41:24
48:10 52:24 55:11

**guess** 10:5 16:10
17:5 28:6 73:4 75:25

**guidance** 66:11,25

**guy** 42:19,23 47:4
55:15,19

**guys** 67:24 100:8

---

**H**

**habitually** 63:11

**hand** 21:25 22:1
65:21 93:4

**handbook** 59:5
87:22

**handcuffing** 39:3

**handed** 22:22 59:3

**handled** 88:14

**happen** 21:15 51:1,4

**happened** 31:24
32:19 83:18

**happening** 54:19
61:5,8

**Hardy** 55:17

**heading** 102:25

**hear** 66:21

**heard** 26:22

**hearing** 66:13

**Hey** 21:10 43:20
63:13,18 68:1 103:7

**higher** 58:2 69:8
71:23 74:12

**Highway** 7:18

**hire** 30:21 52:23
53:9,10,13,15 54:1,
23 56:5 74:3

**hired** 35:18 36:4
47:6,17 48:3 50:8
52:1 53:3 54:23 55:1
68:24 81:13,17

**hires** 58:23

**hiring** 52:11 64:15

**hold** 18:21 74:6

**holding** 65:21

**home** 70:2 101:1

**homicides** 68:17

**hope** 89:19 106:21

**hoping** 94:10

**hour** 8:25 12:12,15,
16,25 13:2,7,23 27:7
51:13

**hourly** 10:9 11:22
51:10 52:12,15

**hours** 18:24 19:5,12
25:10,12 26:5,6,20,
24 28:11,13,20,23,25
29:3,23 51:14,16
52:3,8 54:17 59:10,
12,15 60:5,9,12,16
61:7 74:15 78:8,14,
16 79:5 86:21 87:21
90:25 92:9 93:15
94:8,11 95:23,24,25

96:7,8 98:9,25 99:5,
13,14 100:7,8,20,25
103:18,25 104:10,13,
15,16 105:5,14,16

**house** 101:5 102:7

**houses** 99:19

**Housing** 5:20 27:22
38:12 39:15 45:9

**HR** 71:1

**hundred** 74:7 90:14

**hung** 62:17

---

**I**

**I'M-THE-BOSS**
68:20

**ID** 44:9

**idea** 58:21 68:7
84:24 89:7

**ideas** 71:23

**immediately** 60:24

**implement** 78:7

**important** 6:6

**improve** 68:7

**improvement** 67:25

**incident** 32:14 33:5

**include** 32:25 33:4

**including** 70:24

**increased** 12:25

**independent** 18:16
28:3 29:5 30:5,6

**indicating** 49:6
50:16 56:14 60:7
69:25 73:3 80:8,14
90:3

**individual** 23:17
79:23

**individually** 79:3

**individuals** 60:2,21
72:20 77:23

**information** 24:22,
25 89:21,23 97:21

**initial** 7:12

**initially** 12:12 16:18
32:3 33:19

**input** 58:18 64:20,21
69:7 73:24

**inside** 40:2

**insurance** 49:10
87:8 101:8

**interaction** 68:11

**interesting** 16:12

**internet** 88:4,13

**interrupt** 6:12

**interview** 12:3 46:3
53:19,24

**interviewed** 11:23,
25 53:22 54:1

**intimated** 60:20

**investigate** 31:14,
15,16

**investigation** 65:15
66:8,22

**investigations**
101:9

**investigative** 32:14

**IRS** 92:24

**issued** 44:10

**issues** 46:7 64:25
71:3,14

**itemizations** 86:19

---

**J**

**Jackson** 59:23

**janitor** 71:25

**January** 15:11 20:16

**Jenkins** 32:8 43:10
56:24 57:4,12 58:3
61:24 75:13,21
78:18,19,21 79:2,16

**job** 18:23 19:20 20:5
46:8 47:14 48:7,18,
21 49:9,14,17,20
50:7 52:3 54:14


ZAHN
COURT REPORTING
www.zahncourtreporting.com

65:24 72:15 75:4,9,
10 80:8,11,14 84:25
105:10

**jobs**  17:10 67:12

**joined**  15:9

**joining**  14:3

**July**  11:14,15 15:21
17:18 18:16 20:1,18
21:3,7 44:12

**June**  11:12,14 15:21
17:18 18:16 21:7
23:1 44:11

**jurisdiction**  92:14

### K

**keeping**  28:1

**Kerry**  5:3

**Kevin**  59:22 68:6
76:25

**Keyond**  12:1 18:4
25:16,23 26:12 31:1,
9 32:3 34:13 39:19
40:8 42:3,17 47:3
53:4,24 55:9

**kind**  6:12 30:19 31:2
35:8,18 47:3 50:10
58:10 60:4 68:4
77:11 85:22 89:5,8
93:25

**KM8**  7:17

**knew**  10:8 19:20
33:13 47:8,10,16,24
65:19

**knowing**  96:10

**knowledge**  18:12
28:8 84:16 90:2
104:2

### L

**label**  22:4

**Labor**  86:2

**lack**  75:13

**Lalonde**  82:12,13

**large**  5:5

**late**  63:2,6,12

**law**  10:7 11:3 15:4
35:8,14 52:19 90:20
92:18

**lawsuit**  8:25 9:19
10:3 47:15 91:18

**lawyer**  88:9,12 91:12

**laying**  79:14

**league**  65:16

**learned**  70:25

**leave**  55:14 63:2,7
84:21 105:1

**left**  8:13 9:14 10:18
14:9 32:5 39:21 40:9,
10 42:17 46:16,22,25
47:4,5 54:9 55:4,9,10
84:18

**legally**  90:16,17

**letter**  11:3 47:20,21
48:11 50:15 52:22
56:3 57:9,10 58:24
69:20 79:8,25 80:3
84:12,14,20 97:24

**letterhead**  33:20

**letting**  22:19

**level**  52:2 58:2 64:2
74:12

**license**  35:20,22
36:4,10,16,24 37:12

**licensed**  35:22

**licensing**  77:6,14

**lied**  96:17

**lieutenant**  20:2

**lights**  70:4

**limits**  90:6

**list**  89:11

**lived**  8:12

**living**  8:16

**located**  16:17

**location**  16:20

**logo**  44:16

**long**  8:12 9:17 17:12
18:25 19:25 81:6,9

**longer**  20:11 56:22

**looked**  25:14 62:14

**lot**  18:23 43:17,19
51:23 54:17 68:11,19
104:22

**love**  15:4

### M

**made**  12:6 20:15
39:18 56:11 61:16,19
64:24 72:10 73:7,9,
13 78:16

**maintenance**  50:22

**make**  5:24 10:10
20:13 23:21 30:19
57:8 61:21 63:21
66:1 68:1 69:8 72:4,7
73:18 74:12 77:1
79:5 84:25 98:21

**makes**  39:8

**making**  51:10 73:16
78:13

**manage**  47:18 48:8,
9 51:21 64:4 65:6
70:16 72:13 73:24
74:17 81:2

**managed**  56:16
58:11

**management**  45:11
58:2 69:8 72:17
74:13,16

**manager**  49:18
51:19 54:22,25 55:6
56:4 61:10 71:16
75:4 101:20 103:12
105:12,19

**managerial**  55:13
75:14 81:3

**managers**  43:9

**managing**  60:11
69:9 71:20

**Manny**  55:19

**Marc**  9:11 17:23
22:12 36:3 38:4
39:21 40:9 42:3
94:22

**Mark**  5:2,12 7:12
96:1

**marked**  22:6 24:8
45:3 49:23 76:6 78:3
82:3 84:7 85:15
93:10 97:12

**married**  16:14

**matter**  27:18 52:3
72:3

**means**  80:5

**meant**  23:9

**Medicare**  86:24
92:23

**medications**  7:7

**meeting**  83:16,19
84:21

**member**  74:1,3

**members**  9:8 57:15,
19 61:2 63:2 76:25

**memory**  92:1

**mentioned**  60:19

**mere**  99:7 100:15

**Merit**  5:3

**messed**  56:10,19

**met**  84:19

**middle**  7:12 69:25

**mile**  38:1,6

**mileage**  70:14 71:19

**miles**  21:9 38:5

**mind**  5:21 77:15
106:13

**mine**  38:1,5,7,24
62:22

**minute**  86:11

**minutes**  9:17 63:12

**Misclassification**


ZAHN
COURT REPORTING
www.zahncourtreporting.com

82:2

**misclassified** 84:2

**misconduct** 58:7

**mistake** 22:20

**moment** 6:16

**Monday** 5:6

**money** 51:12 74:15
75:6 100:12

**monies** 89:13

**monitor** 42:25

**month** 21:14

**months** 8:14 9:23
10:2

**morning** 59:14
99:17

**moved** 8:13 46:18,
19

**moving** 51:24

**murdered** 102:23

**music** 14:20

---

**N**

**named** 55:16

**names** 94:23

**Nashville** 14:13

**Nate** 63:11

**Nathan** 68:6 77:1

**Nathaniel** 59:22

**National** 7:17

**needed** 8:4 48:21
58:15,19 61:3,9
63:16 65:15 66:7,22
67:8 74:2,17

**Nh-huh** 41:9

**night** 69:25 101:10
104:15

**nomination** 14:23

**nonemployees**
23:9

**nonmanagement**
64:2

**nonsalaried** 41:24

**Norfolk** 14:12 17:15

**normal** 6:13 25:5
43:18 46:5 75:8,9
81:3 99:9 102:24

**North** 5:16,19 6:21
7:1,3 22:8,14 24:10
45:4 50:1 66:23 76:8
78:5 82:5 84:9 85:17
91:8,10 93:12 97:14
98:15,19,20 106:14,
24

**Notary** 5:4

**notice** 5:5 34:15
85:22

**noticed** 27:22

**notify** 99:24

**number** 22:7 24:9
44:24 45:3 49:16,24
50:13,15 57:5 76:7
77:21 78:4 82:4,11
83:25 84:8 85:9,16
86:20 87:22 93:11
94:5 97:13

---

**O**

**oath** 6:15,16 7:5

**object** 91:6

**obsolete** 15:3

**obtain** 34:5

**occurred** 60:6

**off-duty** 13:22 17:11

**offer** 12:5,11 20:14
45:2,10 47:20,21
50:15 84:12,14,20,25

**offered** 49:19 81:14,
17 83:4

**office** 40:3,25 50:20

**officer** 13:14,22
14:13 17:19 33:11,12
37:10 45:11 77:5,9,
13

**officers** 13:10
101:19,22

**offices** 5:7

**official** 67:14 77:11

**operate** 34:23

**operation** 30:20

**operational** 43:11

**operations** 64:6

**opinion** 67:5 69:13

**opportunity** 21:9

**oral** 5:1

**order** 37:8 40:5
42:19

**orientation** 58:23

**original** 50:14

**outline** 91:23

**outlined** 79:6 82:22

**overlap** 46:6

**overlook** 66:1

**oversee** 42:25

**overseeing** 77:5,14

**overstate** 104:6

**overtime** 29:9,20,25
30:7 51:22 52:9,17
86:6 90:25 92:9 93:2
98:24 105:11,17

**owed** 86:5 89:13

---

**P**

**p.m.** 5:6 107:2

**package** 22:13

**packet** 93:13 96:6

**pages** 24:8 45:2
49:23 78:3 82:2
85:15 93:10 97:12

**paid** 10:9 13:3,22,23
14:14 23:10,17 24:18
25:3,10 27:6,19
28:18 29:1 30:11
38:15 51:13,20 86:14
87:1 88:21 92:11,22

97:10 98:11,24
101:18 105:16

**paper** 16:3 21:1
40:25 73:2 78:11

**paragraph** 33:2

**Pardon** 75:19

**part** 10:5 16:4 17:6
29:24 45:20 60:3
67:13 100:16

**part-time** 16:21
18:7,23 19:1 29:6,21

**parts** 51:24

**pass** 62:14

**patrol** 31:11 35:1
43:5,6,18 46:4 57:16
62:12 80:19 102:25

**patrols** 78:8 79:18
80:16

**pay** 27:12 29:9,20,24
41:15 51:8 52:9
58:10,15 86:25 89:8
92:21,22,23 93:6,10,
16 95:9 97:9,12

**paycheck** 12:21

**paying** 13:20 88:19

**payment** 24:7,14
27:21 98:3

**payroll** 25:5 27:23
60:7 88:4 97:23

**peace** 36:8 37:16

**pecking** 42:19

**pen** 104:8

**people** 10:9 27:17
35:20 42:24 51:21
53:25 54:5,13,17
55:2,4 56:16 59:16
62:15 64:1,3 68:18
72:14 74:14

**percent** 86:25 89:2

**percentage** 89:1

**Perez** 55:20

**Perfect** 66:19

**perform** 35:23



ZAHN
COURT REPORTING
www.zahncourtreporting.com

**performed** 64:7

**period** 12:24 29:9 89:14

**perks** 70:18 71:15

**Perry** 59:22

**person** 9:8 42:16 53:15,18 79:23 101:11

**personal** 40:6 44:3, 5

**personally** 53:17

**Philippines** 7:20 8:8 11:8

**pictures** 32:25 33:4

**piece** 100:7

**Placards** 41:2

**place** 21:2 56:6 67:18

**plan** 87:4

**pleased** 45:9

**point** 18:22 19:23 52:5,6 67:15 79:9 101:16

**police** 13:22 14:9,12 31:6 33:11 37:10,25 68:12,14 99:24 102:6,10,12 103:10

**policeman** 17:6,11, 13

**policies** 67:17 71:24

**policy** 73:7,9

**Portsmouth** 5:8,20 38:11 39:14 44:15 45:8 58:23 71:16 84:1 94:6

**position** 10:8 11:23 15:14 35:24 42:13,18 45:10 47:1 61:16 63:4 69:24 71:10,12, 16 72:2 81:14,18 83:5

**postal** 7:20

**posted** 11:22 30:17 40:2

**powers** 37:25

**present** 71:22

**press** 103:22

**presume** 92:19

**pretty** 40:10 85:20 94:20 102:24

**prevail** 92:7

**previous** 96:10 102:18,19

**previously** 46:2

**PRHA** 5:7 34:7 36:7 37:24 41:3,14 95:6

**primarily** 14:19

**printed** 62:16,24

**printout** 25:25

**prior** 14:3,7 38:25 69:22

**privilege** 91:7

**problem** 27:19

**procedure** 34:18

**procedures** 30:18 67:17 71:24

**process** 6:4 34:17 67:24

**processes** 30:18

**professional** 9:9

**program** 45:11 49:18

**programs** 49:18

**promised** 47:12 50:18

**promoted** 20:1,23 21:9

**promotion** 21:2

**properly** 92:22

**properties** 34:14 43:5,12 57:16

**property** 31:16 34:17 37:24,25 38:2, 5,6 43:9 46:7 62:5

**prove** 100:16,17

**provide** 12:6 16:24 18:7,25 19:21 34:2,3 40:16 41:5,9,10

**provided** 11:10 16:5 17:17 24:24 25:15 26:24,25 29:6,20 41:13,20

**providers** 60:17

**providing** 10:19 13:10,14 15:20 16:21 17:20 35:7 56:16

**Public** 5:4

**purposes** 26:8

**pursuant** 5:5

**put** 6:16 21:11 22:4 28:9 47:12 50:20,21, 23 52:7 60:7 67:17 85:4

---

**Q**

**qualification** 13:15

**qualified** 95:8

**qualifying** 93:24

**quasi** 61:16

**question** 27:12 51:25 59:12 61:18 65:25 71:21 72:23 102:19

**questions** 6:5 56:2 67:2 93:25 105:24 106:11,20

**questionwise** 91:15

**quickly** 18:23 21:8

**quit** 50:19 73:16

---

**R**

**radio** 102:9

**Radios** 40:22

**raise** 58:10,15,19 74:8

**ran** 11:19 35:21 67:15 68:23 87:13 102:20

**rate** 51:10 86:22 94:12 95:24

**read** 26:9 59:3

**realistic** 80:2

**reason** 9:24 63:3

**reasonable** 90:12, 18

**reasoning** 28:5

**reasons** 40:7

**recall** 12:10 17:4 25:4 61:1,5 62:19 63:1,5,9 67:23 79:14 84:23 91:16 98:5,10 100:18 102:21

**recalled** 85:21

**receipts** 87:9

**receive** 58:10 106:21

**received** 43:20,21 93:16

**Recess** 98:18

**recognize** 44:23 82:8 83:22 85:6

**recollection** 45:15 63:8 103:17,25

**recommend** 53:14 56:9 58:9,14

**recommendation** 57:12

**recommendations** 69:8

**record** 7:11 59:10 73:10 97:3 98:16,19, 25

**recorded** 28:25

**recording** 26:19

**recordkeeping** 26:8

**records** 25:19 94:20 100:14



Mark Carman - May 15, 2023                                                                120

**Redevelopment**
5:20 38:12 39:15
45:9

**reducing** 78:7

**Reduction** 78:1

**refer** 5:21

**referred** 18:1 30:22

**refresh** 45:14 92:1

**regard** 10:3 27:14,20
28:17 42:7

**Registered** 5:3

**reimbursed** 92:20

**reinstate** 80:16

**related** 67:11 69:9
96:6

**relationship** 11:18

**remain** 71:12

**remember** 11:11,24
16:13,15 19:1 35:11
36:1 40:14 59:1 61:8
80:17,20,22,23
83:11,12,15 92:2

**report** 31:13,17
32:17 33:21 34:17

**reported** 42:2,6,16
57:4,22 64:2 72:20
102:21

**reporter** 5:3 6:7,23
66:12,16,19 96:21

**reporting** 42:7 46:10
86:1

**reports** 32:14,15
42:9 57:20 65:24
66:1

**represent** 5:20

**request** 58:5 74:12
86:4 106:19

**requested** 89:21

**require** 46:6

**required** 25:11 34:5
36:23 37:2

**requirement** 67:9

**researched** 52:19

**reserve** 14:8,17
106:10

**resignation** 85:4,9,
14

**resigned** 20:19
21:16,21 59:25

**resigning** 85:25

**resources** 54:18
75:6

**respond** 6:6 69:25
70:11 99:21,25
102:15

**responded** 11:23
83:13,14,16

**response** 83:8 88:6

**responsibilities**
67:3

**responsible** 78:12

**result** 72:12

**retain** 18:15

**retained** 18:15 34:1

**retainer** 89:8

**retire** 15:1

**Retired** 8:23

**returned** 8:7

**review** 91:17 106:21

**rid** 81:11

**Riddick** 18:2,6

**risk** 45:11

**role** 42:20

**roll** 103:7

**rolled** 102:22

**room** 12:4

**roughly** 21:19 100:9

**Rules** 5:9

**run** 67:10,18

---

**S**

**S-U-R-I-G-A-O** 7:19

**safety** 46:10

**salaried** 105:11

**salary** 27:1,3 28:9,19
41:22 44:7 45:12
47:9,18 50:10 51:21
52:2 97:10,22,23
101:18 105:6

**sat** 50:20

**Saturdays** 104:22,
23

**save** 25:20

**schedule** 19:7,15
30:17 39:17,18,25
42:23 61:25 62:1,17,
23 65:23 79:15

**schedules** 57:9,11,
15 61:19

**scheduling** 19:3
42:12 64:10

**searching** 88:13

**security** 13:9,13,14
16:24 17:8,19 31:3
34:4,7,10 35:1,6,15,
23 36:25 37:21 40:19
41:24 45:11 48:9
49:18 50:5 52:24
53:20 55:1,11 56:16
64:3 72:16 78:2,7
79:4 86:23 92:21

**seek** 66:11 67:4

**self-paid** 87:9

**send** 82:18

**sending** 39:10

**senior** 42:19 47:4

**sense** 5:24 23:21
39:8

**separate** 86:19

**September** 47:13
50:21

**serious-nature**
99:23

**serve** 77:4,13

**services** 10:19
11:10 12:6 13:5,10
15:21 16:5,22,25
17:18,20 18:7 19:21
26:24,25 29:6,21
34:2 35:7 41:20
56:17 60:17 64:7

**setting** 42:22

**sheet** 25:17,25

**sheets** 95:9 97:19

**Sheriff's** 13:18,19

**shift** 31:18,22 33:21
57:21,23 100:24

**shifts** 62:13

**shirt** 41:11,13,14

**shooting** 31:14
59:14 99:22

**shootings** 68:15

**short** 12:24 91:6
106:7,10

**short-shoot** 93:25

**show** 33:1 65:23
77:17

**showed** 65:10 72:15

**showing** 25:12

**shut** 56:13 71:8

**sic** 75:13

**side** 16:1,5

**sign** 38:10 59:4

**signature** 23:3
24:11 45:5

**signed** 48:14,15
50:11,12 52:21 56:3
57:4 58:24 60:22
69:19 80:3 84:11
94:22

**significant** 31:25
69:7

**signing** 49:1 79:8

**similar** 8:25

**single** 50:3 93:18


www.zahncourtreporting.com

104:19

**sir** 7:14 23:4 50:17 92:6 93:19 96:12 98:1

**sit** 53:8

**situation** 33:1 43:20 65:14 101:17 102:20

**skills** 33:11

**sleeping** 99:18

**sloppy** 26:16

**slot** 50:23

**slots** 50:22

**smoothly** 67:18

**So-and-so** 56:19

**Social** 86:23 92:21

**someone's** 34:16

**son** 8:3

**song** 14:14

**sort** 39:4 88:15 99:23

**sounds** 21:13

**South** 5:7

**speak** 60:8

**special** 36:7,11

**specialized** 88:14

**specific** 36:23 43:19 71:17 81:10 100:11

**specifically** 28:16 56:11 68:15

**specifics** 31:5

**speculation** 99:7 100:15

**spell** 7:15

**spent** 89:4

**spoken** 9:13 89:16

**spot** 33:23

**St** 16:18

**stabbing** 102:22

**staff** 56:6 78:8,13

**start** 12:17 19:6

**started** 6:24 10:4 14:12 15:20 17:23 21:7 44:13 60:10 66:21

**state** 7:10

**stated** 47:20,21

**statement** 89:5

**States** 7:22

**status** 82:3

**stay** 21:11

**steps** 36:13

**sticker** 85:4

**stipulate** 96:13 97:17

**Stithe** 59:20

**stock** 40:25

**stop** 105:9

**stopped** 105:7,13

**store** 29:24 30:2

**stores** 17:7

**straight** 27:8,9,11

**Street** 5:7

**struggling** 73:4

**stuff** 39:4 43:12 44:9 49:10,11 68:4 93:21 94:19

**subject** 41:18

**submit** 26:23 27:3 38:18 57:19 58:1 71:18 73:24 94:5 97:8 104:1

**submitted** 23:1 25:9 57:11 58:2 66:5 93:15 95:24 96:3

**substance** 9:19,23

**sued** 81:19,20

**sues** 81:21

**suggestion** 68:1

**suggestions** 73:13, 16,18

**Summary** 97:12

**Sundays** 104:22,23

**supervise** 42:25

**supervisor** 16:8 18:4 96:4

**supervisory** 46:15

**supplies** 74:15

**support** 24:17

**supposed** 30:12 49:4 65:20 74:23 75:21 81:2 101:20

**Supreme** 5:9

**Surigao** 7:19

**Susan** 5:19

**Sussex** 20:4,8,24

**swore** 6:24

**sworn** 5:12 6:17

**system** 34:21,24 68:12,13

---

**T**

**takes** 52:4 95:18

**taking** 6:14 7:6

**talk** 9:10,18 10:1,17, 22 11:7 22:11 31:6 49:13 53:9,19

**talked** 9:3,6,22 10:2, 12,13,14 11:6 46:15 64:25 91:12

**talking** 36:11 65:12 69:10 77:10 79:22 84:1 102:3

**target** 41:22

**tax** 23:12 86:23

**taxes** 18:22 27:23

**teach** 34:25

**team** 51:21 52:24 54:4 56:10,16 57:8, 15,19 58:6 59:17 60:11 61:2 63:2 72:14 73:25 74:1,3 76:25 79:23 94:6

**team-type** 68:19

**technically** 16:4 54:24 57:3 64:2 68:25

**teeth** 71:6

**telling** 47:11 61:14 71:5

**ten** 82:1

**Tenisha** 59:20 68:6 76:25

**Tennessee** 8:3

**terminate** 56:20

**terminated** 56:10 71:1

**testified** 55:4

**testifying** 50:9 96:7

**testimony** 6:17 7:8 9:22 48:14 64:1,8,10 95:8 105:4 106:2

**thereabouts** 60:23

**therefrom** 27:24

**thing** 23:13 54:11 68:21 88:15 94:3 99:17,24

**things** 8:14 35:2 43:11 46:6,12 67:25 68:6,7 73:6 74:24 75:5,7 76:21 91:13 101:3,7,15 102:4

**thought** 21:18 29:19 38:21 58:14 75:10 96:18 105:3,10

**thousand** 51:9 74:7 90:14

**threshold** 52:7

**thrown** 21:10

**time** 6:6,8 10:2,5,13 11:7,9 12:25 15:18, 22 16:5 17:6,14,19 20:15 21:12 25:9,17 26:5,6,20,21,25 27:3, 7,8,9,11 28:9,22 29:9,11,20,24 30:17 33:8 35:9 41:19 45:15,18,20,21,24



46:17 47:8,12 54:24
55:3 56:15 58:11
60:3,22 61:3 62:16,
22 65:21 66:14 72:24
77:16 80:25 82:6,23
87:12 88:10 89:14,
18,25 92:21 93:20,23
95:16 96:8 97:9
98:22 100:4 103:24
106:16

**timecard** 25:12,13

**times** 10:11 39:23
43:18,19 60:20 62:5
72:3,22 99:16 101:5
104:14,22

**timing** 48:4

**tip** 43:21

**today** 6:15 7:7 9:4,
20 103:21 105:24
106:16,25

**told** 10:6,8,25 11:2
13:20,21 18:10,20
20:10,22 28:20 30:17
32:21 33:25 42:23
43:6 49:5,7 51:15
54:8 59:11 72:13
79:9 80:6 81:7 85:24
99:24 100:15 105:13

**top** 43:16 104:15

**total** 86:13,21,25
94:17

**track** 68:18 105:4

**trained** 34:6,9

**training** 33:10 34:3,
6,12 35:19 59:2 77:6,
14

**transfer** 20:8 21:2

**transferred** 20:4,24

**transpired** 31:21,23
83:20

**Traverse** 69:22

**treated** 30:22

**treatment** 28:2

**trial** 106:11

**turn** 6:21 26:9 28:20

32:1,8 51:16 59:12,
15 70:13 82:17 95:21
100:15 104:13
105:14,16

**turned** 18:23 25:20
26:15,18 29:1 32:5
73:15

**two-day** 19:11

**type** 26:7 59:2 68:21
92:17 96:5 97:19

**typed** 25:18 32:19

**typical** 100:3,6
104:3,7

## U

**ultimate** 64:18,25
69:6,11

**Um-hum** 17:16 24:6
59:6 83:23 94:13

**un-** 46:11

**unarmed** 36:16
78:10

**understand** 5:25
6:18 23:6 29:4 30:5,
11 48:4 51:19 53:12
60:15 71:13 72:5,6,8
91:20,24 92:4 93:1
95:14 98:22 103:23
106:14

**understanding**
18:17,18 23:14 37:5
48:7 52:1

**understate** 104:7

**understood** 23:16
29:10,15 30:9,10
37:1 48:1 52:18 77:1
105:24 106:12

**unfair** 90:13

**unfit** 46:11

**uniform** 41:12

**uniforms** 75:7

**United** 7:22

**unlawful** 29:19

**unpaid** 28:8 87:21
93:2 100:12

**unreasonable**
90:13

**unsafe** 101:11

**USA** 8:4

## V

**vacation** 87:21 98:3,
9

**Val** 78:24 79:2

**Valencia** 78:18,22

**Valerie** 32:8 43:10
56:24 57:4,12 58:3,
14,17 61:13,23 67:8,
11 75:21 78:18,21

**vehicles** 30:19

**vendor** 23:11 24:14,
18

**verbal** 12:7,9

**verify** 94:14 95:2

**vests** 41:2

**violation** 86:1

**Virginia** 5:5,8,9 14:4
15:9,23 16:9 19:16
20:24 21:21 29:7,22
33:12 36:8

**VRS** 20:22 50:24
86:24

## W

**W-2** 28:10 45:16
60:21

**W-4** 23:19

**W-9** 22:6,23 23:7

**wage** 8:25 11:22

**wages** 28:8,17 86:6
93:2

**wait** 66:17 69:5
86:10

**walk** 22:1

**walked** 34:13

**wanted** 26:19 30:11
32:21 33:7 35:4 49:2
50:4 65:13 74:13

**warden** 16:10

**Watson** 16:15,16

**weapon** 41:6

**weapons** 36:19 41:4
76:18

**week** 12:15 19:9
29:23 52:8 60:9,12
99:5,9,10 100:3,6,8,
20 103:18,25 104:3,
7,13,14

**weekend** 78:8 79:18
80:16,18

**weekends** 104:21

**weeks** 19:2,11 25:4,
7 55:16,20

**whack** 68:1

**whatsoever** 64:20
75:11

**whomever** 68:9

**wife** 8:20

**win** 88:21 90:17

**windows** 46:11

**Winston** 32:9 43:15
79:16 82:19

**woman** 102:22

**work** 13:21 14:1,2,7,
9 16:1 17:10 19:1,12,
20 20:11,14 21:10
23:23 37:7 39:23
40:7 52:8 60:14
63:18,19 68:5,14
78:13 99:9,12,14
100:24,25 104:24
105:2

**worked** 13:7 14:16,
17 15:7 16:20 17:6
19:8 25:10,12 26:6,
20,24 27:4 28:11,14,
23,25 29:7,23 35:8
54:17 55:15,20
60:12,16 63:17 79:3



86:22 90:25 91:1
94:11 95:16,23 96:8
98:24 99:1,6 100:4,
20 103:17 104:8,9
105:5

**worker** 50:22 82:3
84:2

**Workers'** 87:8

**working** 10:5 12:18
13:19 30:13 45:19,24
51:14,16 60:4 87:1
89:20 100:8 106:18

**worry** 55:24

**worth** 106:5

**write** 25:17 32:13
56:20

**writer** 14:14

**writeups** 41:19

**writing** 12:7 33:2
83:15 89:21

**wrongdoing** 58:7

**wrote** 61:24 88:10

---

### Y

**year** 51:9

**years** 17:14

**you're-not** 68:21

---

### Z

**Zahn** 5:3 6:15,22


www.zahncourtreporting.com